**Woodrow TALAS, Appellant (Plaintiff below),**

v.

**CORRECT PIPING COMPANY, INC., Appellee (Defendant below).**

No. 381S52.

Supreme Court of Indiana.

May 18, 1982.

Michael R. Morow, Munster, for appellant; Leonard M. Ring & Associates, Chicago, Ill., of counsel.

Samuel J. Furlin, Spangler, Jennings, Spangler & Dougherty, P. C., Merrillville, for appellee.

HUNTER, Justice.

This cause was brought before this Court on the petition to transfer of Woodrow Talas, who sought review of the Court of Appeals' opinion found at *Talas v. Correct Piping Co., Inc.,* (1980) Ind.App., 409 N.E.2d 1223. We have previously granted Talas's petition, vacated the opinion of the Court of Appeals, and twice remanded this cause to the Full Industrial Board of Indiana with instructions that the Board enter the specific findings of fact upon which its decision is based. *Talas v. Correct Piping Co., Inc.,* (1981) Ind., 426 N.E.2d 26; *Talas v. Correct Piping Co., Inc.,* (1981) Ind., 416 N.E.2d 845.

On June 25, 1978, Talas fell from scaffolding while acting in the employ of Correct Piping Company. As a result of the fall, Talas was rendered a traumatic quadriplegic.

The record reveals Talas was hospitalized until August 3, 1978, when he was transferred to the Rehabilitation Institute of Chicago located in Chicago, Illinois. He was released from the Rehabilitation Institute on January 19, 1979, and returned to his home, where he received around-the-clock nursing care until June 16, 1979. Correct Piping Company paid the expenses of the nursing care until May 13, 1979.

Meanwhile, Talas and Correct Piping had executed a Form 12 agreement which was approved by the Industrial Board on April 6, 1979. Therein, the parties stipulated that Talas had suffered temporary disability from June 26, 1978, until December 6, 1978, and that he had sustained "100% permanent impairment of the man as a whole and 100% total permanent disability." The parties agreed that Talas should be awarded $120 a

week for a period not to exceed five hundred weeks, the maximum time frame established under the Workmen's Compensation Act. *See,* Ind.Code § 22–3–3–8 (Burns 1981 Supp.); Ind.Code § 22–3–3–10 (Burns 1981 Supp.); Ind.Code § 22–3–3–22 (Burns 1981 Supp.).

Included in the Form 12 agreement was the following stipulation by the parties:

"It is agreed that the injury is in a permanent and quiescent state. It is further agreed that the question of continuing treatment for the employee's injuries, including surgical, hospital and nursing services and supplies, has not been agreed upon, and shall be left to the determination of the Industrial Board upon proper hearing pursuant to the Workmen's Compensation Act of the State of Indiana."

On September 21, 1979, Talas filed an emergency petition with the Industrial Board seeking an award of nursing care and services as necessary to sustain and maintain his life.

A hearing was held on the petition on November 28, 1979; based on the evidence and recognition that the Industrial Board may order an employer to furnish medical treatment, services, and supplies so as to limit or reduce the extent of impairment, the hearing officer ordered Correct Piping to pay for "all the medical and nursing care needed by plaintiff as a result of his said accidental injury, in order to reduce his disability or impairment."

Correct Piping Company then appealed the hearing officer's decision to the Full Industrial Board. Based on its review of the evidence, the Full Board overruled the hearing officer's determination and directed that Talas "take nothing" by way of his petition.

Talas then sought judicial review of the Full Board's determination, arguing among other things that the Board had failed to enter adequately specific findings of fact. As previously noted, this Court agreed with Talas and so assumed jurisdiction of his appeal. *Talas v. Correct Piping, supra.*

The Board has now presented us with findings of basic fact which embody the specificity necessary to permit an informed and intelligent review of its decision that Talas "take nothing." Those findings supplied to this Court on remand read in pertinent part:

"1. That on or about the 25th day of June, 1978, the plaintiff (Talas) was in the employ of the defendant (Correct) at an average weekly wage in excess of the maximum, and on said date, Talas sustained an accidental injury arising out of and in the course and scope of his employment when he fell causing a fractured cervical vertabra.

"2. Immediately after the accident Talas was taken to the hospital where Correct's workmen's compensation insurance carrier (insurance carrier) began paying the statutory medical, hospital, nursing care services and supplies. Talas was in the hospital until August 3, 1978, at which time he was transferred to the Rehabilitation Institute of Chicago in Chicago, Illinois.

"3. The insurance carrier was informed by the Rehabilitation Institute of Chicago that Talas reached a permanent and quiescent state on December 7, 1978. However, because Talas' family had resisted attempts to give the family specific instructions for the care of Talas at home and the fact that the home had not yet been structurally altered to accommodate Talas, the insurance carrier voluntarily paid to have Talas remain in the Rehabilitation Institute of Chicago until January 19, 1979.

"4. Between December 7, 1978, and January 19, 1979, the insurance carrier voluntarily paid to structurally alter Talas' residence and for some special equipment for Talas. Once the residence was ready for Talas, Talas was released from the Rehabilitation Institute of Chicago to go home on January 19, 1979.

"5. Again, because the family had resisted attempts to instruct them on how to care for Talas the insurance carrier again voluntarily paid attendant help for the plaintiff while he was home until May 13, 1979, when the home life stabilized. The

insurance carrier seeing that the home life had stabilized made no further maintenance payments after May 13, 1979.

"6. On March 22, 1979, Talas, Correct, and the insurance carrier executed a Form 12 Agreement which was approved by this Board on April 6, 1979. Said Agreement provided that temporary total disability extended through December 6, 1978, and ended on December 7, 1978; that the plaintiff was in a permanent and quiescent state; that the plaintiff was 100% permanently impaired of the man as a whole; and that Talas was 100% totally permanently disabled.

"7. Even without the Award of April 6, 1979, (approved Form 12 Agreement) all of the medical evidence was to the effect that Talas had reached a permanent and quiescent state on December 7, 1978, and that he had a 100% permanent impairment of the man as a whole which was true at least as of December 7, 1978, up to the present time.

"8. After May 13, 1979, Talas was attended to by a layman, Mark Jackson, and Talas' wife. The layman was at Talas' home supplying maintenance eight (8) hours per day, including exercises. After the layman left, Talas' wife would take care of the plaintiff's maintenance needs. Talas' condition, needs, and exercise programs started at the Rehabilitation Institute under Dr. Vinod Sahgal were well handled by the layman, and Talas' wife. It was not necessary that a professional nurse care for Talas and the care that Talas received since May 13, 1979, has been excellent without professional help.

"9. Since Talas left the Rehabilitation Institute he only needed someone to provide maintenance such as moving him and to help him urinate. This could be done by anyone with average intelligence, including Talas' own family. Talas did not need a registered nurse for his care, nor any more medical treatment.

"10. Dr. Vinod Sahgal was the treating physician of the plaintiff at the Rehabilitation Institute of Chicago and was therefore quite familiar with plaintiff's exercise program, what the exercise program could do or not do for Talas, Talas' needs, who could provide for Talas' needs, and whether any help plaintiff received would tend to limit or reduce the amount and extent of Talas' 100% impairment. Dr. Sahgal was of the opinion, which opinion the Full Board believes as a true fact, that since the plaintiff left the Rehabilitation Institute of Chicago on January 19, 1979, there was no medical treatment which was necessary to limit or reduce the amount and extent of Talas' impairment or disability and that the amount and extent of Talas' impairment would never be reduced.

"11. The Board is aware that Talas made some self serving statements that some of his joints feel better if he exercises four (4) times per day rather than the present two (2) times. Regardless of the fact that Talas did not show why he can't exercise four (4) times per day without statutory medical, the Board does not believe that Talas' exercising, two (2) or four (4) times per day, is necessary to limit or reduce the amount and extent of his impairment. This is especially true when Talas' statements are viewed in conjunction with the treating physician (Dr. Sahgal, who instituted the exercise program) testimony that there was no care which would limit or reduce the amount and extent of Talas' impairment.

"12. That, in addition, Talas introduced into evidence certain medical bills paid by him and certain medical bills which are unpaid. The medical bills introduced by plaintiff were either without proper identification, and/or without any proof as to what they were for, and/or whether they were deemed necessary by the attending physician, and/or whether they were due to or caused by the accident involved in this cause, and/or whether they were obtained on plaintiff's own behalf, and/or whether they were charges as prevailed in the same community for similar services to injured persons of the like standard of living when such services are paid for by the injured person; further, Talas did not prove to the satisfaction of this

Board that any of the medical bills introduced into evidence by the plaintiff were necessary to limit or reduce the amount and extent of Talas' 100% impairment and/or his 100% total permanent disability."

These findings of basic fact "reveal the Board's determination of the various relevant sub-issues and factual disputes which, in their sum, are dispositive of the particular claim or ultimate factual question" before it, as required by Ind.Code § 22–3–4–7 (Burns 1974). *Perez v. United States Steel Corp.*, (1981) Ind., 426 N.E.2d 29, 33; *see also, Kunz v. Waterman*, (1972) 258 Ind. 573, 283 N.E.2d 371; *Whispering Pines Home for Senior Citizens v. Nicalek*, (1975) Ind.App., 333 N.E.2d 324. Within the framework of these findings, we turn to the merits of Talas's substantive contention.

Via inter-related allegations, Talas maintains the evidence does not support the Board's conclusion that he "take nothing" under a proper construction of Ind.Code § 22–3–3–4, *supra.* The statute governs the award of medical and nursing treatment, services, and supplies.

■ Our analysis of Talas's contention proceeds from the threshold appellate perspective that it is not this Court's prerogative to weigh the evidence or judge the credibility of witnesses; in our review of the Board's findings and conclusions, we may consider only that evidence which tends to support its determination, together with any uncontradicted adverse evidence. Only when the evidence leads inalterably to a conclusion contrary to that reached by the Board will its decision be disturbed. *White v. Woolery Stone Co., Inc.*, (1979) Ind.App., 396 N.E.2d 137; *Penn-Dixie Steel Corp. v. Savage*, (1979) Ind.App., 390 N.E.2d 203.

Defined in Ind.Code § 22–3–3–4, *supra*, are four time frames in which the expenses of medical and nursing services and supplies may be awarded an employee injured in a work-related accident:

1. after an injury and prior to an adjudication of impairment, as the attending physician or the industrial board may deem necessary;

2. during the period of temporary total disability as the industrial board may deem reasonably necessary;

3. after an adjudication or award of permanent impairment, as the industrial board may deem necessary to limit or reduce the amount and extent of impairment; and

4. in an emergency or because of the failure of the employer to provide medical or nursing treatment, services or supplies during the period of temporary total disability.

Talas asserts that pursuant to the evidence, an award of nursing care was justified under any of the four time periods.

■■ To resolve Talas's broadside claim, it is necessary to distinguish "disability" and "impairment," as those terms of art are utilized in Ind.Code § 22–3–3–4, *supra*, and the Workmen's Compensation Act. "Disability" in its general sense refers to the injured employee's inability to work; "impairment," on the other hand, connotes the injured employee's loss of physical function(s). *Perez v. United States Steel Corp.*, (1977) 172 Ind.App. 242, 359 N.E.2d 925; *Allen v. United Telephone Company, Inc.*, (1976) 168 Ind.App. 696, 345 N.E.2d 261; *Kenwood Erec. Co. v. Cowsert*, (1953) 124 Ind.App. 165, 115 N.E.2d 507; *Northern Ind. Power Co. v. Hawkins*, (1925) 82 Ind. App. 552, 146 N.E. 879; Small, *Workmen's Compensation Law of Indiana* § 9.5 p. 245–7 (1950).

Here, Correct Piping did assume the expenses of nursing care provided Talas until May 13, 1979, over one month subsequent to the Industrial Board's approval of the parties' agreement wherein it was stipulated Talas had sustained both "100% permanent impairment of the man as a whole and 100% total permanent disability." Consequently, Talas's petition for nursing services does not fall within the ambit of clause 1, which concerns the period of time prior to an adjudication of impairment.

Nor does Talas's petition fall within the purview of clause 2, which governs the time frame of temporary total disability endured

by an injured employee. Talas was injured June 25, 1978, and, as per the parties' stipulation, his temporary total disability status ceased on December 6, 1978. Throughout the period Correct Piping did assume the costs of Talas's nursing services.

Clause 4 is also inapplicable. It governs liability for treatment, services, and supplies provided during an emergency or the period of temporary total disability. Talas's condition is in a quiescent state; Correct Piping assumed these expenses.

■ We conclude that Talas's claim falls within the purview of clause 3, which permits the Industrial Board to award treatment, services, and supplies as necessary to "limit or reduce the amount and extent of such impairment [permanent partial impairment]." Ind.Code § 22–3–3–4, supra. We note that while the parties stipulated that Talas had sustained "100% permanent impairment of the man as a whole," the stipulation cannot be interpreted as "permanent total impairment," as opposed to the "permanent partial impairment" described in the statute. The phrase "permanent total impairment of the man as a whole" would necessarily describe death, for the definition of impairment connotes a loss of physical function or functions. The usage of the phrase "100% permanent impairment of the man as a whole" in the Form 12 agreement consequently does not take the question before us outside the ambit of clause 3; indeed, to hold otherwise would negate the parties' stipulation that the issue of continuing medical treatment, services, and supplies remained for future resolution. Correct Piping has not argued otherwise.

That issue thus turns on whether the relief sought by Talas would serve to "limit or reduce the amount and extent" of Talas's impairment. Pursuant to the standard of review incumbent upon us, we focus on the Board's findings of fact and the evidence relevant to that question.

The record reveals no dispute regarding the Industrial Board's finding that Talas's traumatic quadriplegia is in a permanent and quiescent state; Dr. Leo Cooper, who examined Talas in November of 1979, as well as Dr. Vinod Sahgal, who treated Talas at the Rehabilitation Institute of Chicago, indicated that under the present state of medical science, there exists little chance that Talas will ever regain the use of his arms and legs. Cooper described Talas as a "total quadriplegic" and "just a living brain." Sahgal stated that as of September 24, 1979, Talas's quadriplegic condition had reached a "permanent and quiescent state."

The evidence concerning the details of Talas's condition and its ramifications for his existence are also uncontroverted. Talas's self-control over his extremities is limited to meager pronation and supination of the forearms, which renders his hands and fingers virtually useless. He is confined to an orthopedic wheelchair by day, a position he occupies with physical support from a body brace which extends over his legs to his shoes. His forearms are embraced in splints of a "dynamic" nature.

Talas is unable to feed or bathe himself, or to control and attend to his own daily bodily needs. He is supplied with an "ingrowing" catheter and must receive regular bowel care in the form of enemas. A hoist must be used to place him in the bathtub or bed; once in bed, he is unable to turn over without assistance from another.

Talas, with the aid of others, engages in a daily exercise program outlined for him by the Rehabilitation Institute of Chicago, where Talas had undergone similar therapy. The program consists of flexion, rotation, abduction, and the stretching of the muscles and joints of the shoulders, arms, hands, and legs.

It is uncontroverted that Talas's condition leaves him constantly subject to respiratory, bladder, and kidney problems. The record reveals that on at least one occasion, he has been hospitalized for pneumonia and a kidney infection.

For these latter reasons, as well as Talas's complete inability to accommodate his own most basic human needs and daily creature comforts, both Dr. Cooper and Dr. Sahgal indicated Talas's continued existence was dependent upon round-the-clock

assistance from others. The doctors observed that as a quadriplegic, Talas confronted the continuing specter of debilitating medical complications common to the condition: bedsores, bladder and kidney infections, and "anything insidious." Cooper emphasized that if Talas developed bedsores, it would "be a nightmare"; for that reason, he concluded: "It is very important that this patient receive adequate nursing care . . . ." Sahgal indicated that "pneumonia is a serious complication" of quadriplegia and that care should consist of "postural drainage, respiratory therapy, and assisted coughing."

Our examination of this evidence, together with the Industrial Board's findings, leads us to conclude that the Board erred when it found the relief sought by Talas would not serve to "limit or reduce the amount and extent" of his impairment. In so concluding, it is appropriate to harken to the admonition of the Supreme Court of Illinois which, when confronted with the question before us, stated:

"This is a novel and exceptional case. Under such circumstances caution is required in the construction of the particular statute so as not to extend it or affect its general application to the thousands of other cases not presenting such unusual features. *W. J. Newman Co. v. Industrial Commission*, (1933) 353 Ill. 190, 193, 187 N.E. 137, 138.

The "unusual feature" of the instant case lies in the unique nature of Talas's impairment, and it is within that particular context which we address the statutory phrase "limit or reduce the amount and extent of such impairment." Ind.Code § 22-3-3-4, *supra*.

■ It is the longstanding rule of this jurisdiction that terms contained in our Workmen's Compensation Act are to be liberally construed so as to effectuate the humane purposes of the Act; doubts in the application of terms are to be resolved in favor of the employee, for the passage of the Act was designed to shift the economic burden of a work-related injury from the injured employee to the industry and, ulti-

mately, to the consuming public. *Frampton v. Central Indiana Gas Co.*, (1973) 260 Ind. 249, 297 N.E.2d 425; *Pollock v. Studebaker Corp.*, (1952) 230 Ind. 622, 105 N.E.2d 513; *Sam Winer & Co. v. Spelts*, (1976) 169 Ind. App. 392, 348 N.E.2d 670; *Goldstone v. Kozma*, (1971) 149 Ind.App. 626, 274 N.E.2d 304; *DeArmond v. Myers Gravel & Sand Corp.*, (1967) 142 Ind.App. 60, 231 N.E.2d 864; *Lee v. Oliger*, (1939) 107 Ind.App. 90, 21 N.E.2d 65; *In re Duncan*, (1920) 73 Ind. App. 270, 127 N.E. 289.

Here, it is apparent that Talas's status as a quadriplegic is permanent. No medical remedy is available to cure that affliction; nothing can be done to "limit or reduce the amount and extent" of his quadriplegia. This inability to mitigate or positively influence Talas's quadriplegia formed one basis for the Industrial Board's denial of benefits, as its findings of fact indicate.

Talas's impairment—his lost of physical functions—reaches beyond the mere inability to control his arms and legs, however. He is unable to control his most basic daily bodily functions, unable to bathe or feed himself, and unable even to turn himself over in bed, let alone rise and discharge the duties and enjoy the simplest comforts of a person confined to his home. In short, absent assistance and care, Talas would be a hopelessly bedridden invalid who, by virtue of circumstance, would be prone to further medical disorders—pneumonia, kidney and bladder problems, and bedsores—of a life-threatening nature. With assistance and care, on the other hand, Talas can be lifted from bed, take sustenance, bathe, discharge bodily wastes, and enjoy a daily regimen of exercise, postural drainage, respiratory therapy, and assisted coughing, all of which serve to minimize the possibility that additional medical disorders will further complicate his physical condition.

In view of the remedial nature of the Workmen's Compensation Act and the liberal construction to be accorded it, we conclude that the impairment of Talas's physical functions would be limited, if not reduced, by nursing care, as these terms are utilized in the Act. That conclusion follows

even though the care will not cure Talas's quadriplegia, *for in the circumstances present here*, any other construction would be inimical to the humanitarian purposes of the Act. The courts of other jurisdictions with similar statutory provisions which have confronted exceptional factual circumstances like those before us have reached the same conclusion. For instance,[1] it has been held (1) that an employee with permanent sphincteric and urinary incontinence should be awarded practical nursing care to assist with exercises and daily needs, (2) that an amputee was entitled to practical nursing care to reasonably relieve him from the effects of an industrial injury, (3) that an employee with incurable thrombophlebitis warranted an award of periodical attention to alleviate pain although the statute authorized treatment only when "necessary to effect a recovery," and (4) that a victim of manganese poisoning was entitled to the services of an attendant to alleviate his chronic propensity to fall. Likewise, it has been held (5) that a paraplegic was entitled to medical and hospital services to relieve the effects of his incurable condition, (6) that a bilateral amputee should be awarded custodial nursing care to limit the consequences of his inability to fend for himself, (7) that a bedridden employee was entitled to custodial nursing care to alleviate his lack of mobility and inability to care for himself, (8) that the victim of a spinal injury should be awarded expenses for periodic massage and heat treatments to relieve the stiffness in his hands and back, and (9) that a paraplegic was entitled to custodial and nursing assistance as medical services which would limit effects of his injury; similarly, courts of other jurisdictions have ruled that (10) an employee was entitled to custodial nursing care to relieve the effects of his permanently bedfast condition, (11) the victim of an incurable brain injury was entitled to custodial nursing care as medical expenses necessary to relieve him of the effects of his condition, (12) a bedridden employee incapable of caring for herself was entitled to nursing care to relieve the effects of her condition, albeit incurable, (13) a quadriplegic warranted an award of nursing care to relieve his inability to care for himself, even though his condition was incurable, (14) an employee was entitled to chiropractic treatment for the palliative purposes of easing his pain and facilitating his inability to move, and (15) a quadriplegic should be awarded custodial nursing care to reduce his complete inability to accommodate his own daily needs.

The Board's findings of fact also indicate its decision that Talas "take nothing" was predicated in part on the supposition that the only nursing benefit available under the Workmen's Compensation Act is the assistance of a "registered" or "professional" nurse. The Board found Talas's care had been "well handled by the layman, and Talas's wife" and that "It was not necessary that a professional nurse care for Talas and the care that Talas received since May 13, 1979, has been excellent without professional help." The evidence fully supports these findings of fact.

There is no evidence to indicate the care Talas has received since mid-May of 1979 has not been "excellent" or necessary to his limited physical comfort. The record reveals that between May 13, 1979, and June 16, 1979, that care was dispensed on a twen-

---

1. The corresponding citations for the rulings are as follow: (1) *Pickens-Bond Const. Co. v. Case*, (1979) Ark., 584 S.W.2d 21; (2) *Henson v. Workmen's Compensation Appeals Bd.*, (1972) 27 Cal.App.3d 452, 103 Cal.Rptr. 785; (3) *Di Giorgio Fruit Corp. v. Pittman*, (Fla.1950) 49 So.2d 600; (4) *Lopez v. Pennusco Cement & Aggregates, Inc.*, (Fla.App.1981) 401 So.2d 875; (5) *W. J. Newman Co. v. Industrial Commission, supra*; (6) *A. G. Crunkleton Electric Co. v. Barkdoll*, (1962) 227 Md.App. 364, 177 A.2d 252; (7) *Kushay v. Sexton Dairy Company*, (1975) 394 Mich. 69, 228 N.W.2d 205; (8) *Cas-* *tle v. City of Stillwater*, (1952) 235 Minn. 502, 51 N.W.2d 370; (9) *Babcock & Wilcox v. Smith*, (Miss.1980) 379 So.2d 538; (10) *Stephens v. Crane Trucking, Inc.*, (Mo.1969) 446 S.W.2d 772; (11) *Spiker v. John Day Co.*, (1978) 201 Neb. 503, 270 N.W.2d 300; (12) *Howard v. Harwood's Restaurant Co.*, (1956) 40 N.J. 564, 123 A.2d 815; (13) *Orrick Stone Company v. Jeffries*, (Okla.1971) 488 P.2d 1243; (14) *Matter of Wetzel*, (1981) 50 Or.App. 101, 622 P.2d 750; and (15) *Transport Insurance Co. v. Polk*, (Tex.1966) 400 S.W.2d 881.

ty-four hour a day basis by various licensed nurses from a private nursing firm, "Round-the-Clock Nursing." Talas paid for that care. Thereafter, care of Talas was assumed by his wife and a layman, Mark Jackson, who left his position as an unlicensed nurse's aid at the Rehabilitation Institute of Chicago to work for Talas. Talas also paid for Jackson's care.

The latter assistance, which was continuing at the time of the hearing, is limited to that period when Talas's wife is occupied with her employment as a maid at the local Y.M.C.A. The record reveals he arrives at 7:00 a. m. and departs at 3:00 p. m. daily on a weekday basis; in addition to basic nursing care such as feeding and bathing, Jackson provides assistance in coughing, daily physiotherapy treatments, and regular bowel care.

As previously noted, both Drs. Cooper and Sahgal testified it was imperative that Talas receive round-the-clock assistance. While Sahgal did not indicate whether professional assistance was necessary, Cooper praised layman Jackson's work and stated that with "competent nonprofessional help, he [Talas] could probably manage."

This jurisdiction has tacitly recognized that the nursing services available under our Workmen's Compensation Act include practical nursing, as well as the services of a professional or registered nurse. *Allen v. United Tel. Co., Inc.*, (1976) 168 Ind.App. 696, 345 N.E.2d 261 (evidence indicated practical nursing services were not necessary within contemplation of statute). Other jurisdictions have reached a similar conclusion and expressly authorized an award for practical nursing services to employees with work-related injuries which require such services. *See, e.g., Pickens-Bond Construction Co. v. Case*, (1979) Ark., 584 S.W.2d 21; *Henson v. Workmen's Compensation Appeals Bd.*, (1972) 27 Cal.App.3d 452, 103 Cal.Rptr. 785; *Pan American World Airways, Inc. v. Weaver*, (Fla.1969) 226 So.2d 801; *A. G. Crunkleton Electric*

*Co. v. Barkdoll*, (1962) 227 Md.App. 364, 177 A.2d 252; *Kushay v. Sexton Dairy Company*, (1975) 394 Mich. 69, 228 N.W.2d 205; *Alexander v. LaLonde Enterprises*, (1980) Minn., 288 N.W.2d 18; *Graham v. City of Kosciusko*, (Miss.1976) 339 So.2d 60; *Stephens v. Crane Trucking, Inc.*, (Mo.1969) 446 S.W.2d 772; *Spiker v. John Day Co.*, (1978) 201 Neb. 503, 270 N.W.2d 300, *overruling Claus v. DeVere*, (1931) 120 Neb. 812, 235 N.W. 450; *Berkowitz v. Highmount Hotel*, (1953) 281 App.Div. 1000, 120 N.Y.S.2d 600; *Jobin v. American Drilling & Boring Co., Inc.*, (1977) 118 R.I. 480, 374 A.2d 799; *Transport Insurance Co. v. Polk*, (Tex.1966) 400 S.W.2d 881; *Warren Trucking Company, Inc. v. Chandler*, (1981) 221 Va. 1108, 277 S.E.2d 488. *See also*, Larson, *Workmen's Compensation Law* § 61.13(d) p. 10–740 (1981).

In those jurisdictions cited, the award of practical nursing services has been made where the care was provided by an unlicensed practical nurse or by a spouse who, prior to the injury to the marital partner, was unemployed.[2] *See, e.g., Pan American Airways, Inc. v. Weaver, supra; Spiker v. John Day Co., supra; Transport Insurance Co. v. Polk, supra.* Here, the circumstances include an injured employee whose spouse is actively engaged in gainful employment; the record reveals no other family members or persons reside in the home.

■ We are unable to conclude that our Workmen's Compensation Act was intended to require a spouse to quit his or her employment when, by virtue of a work-related accident, the fellow spouse is rendered bedfast and wholly dependent upon others. Workmen's Compensation benefits are not unlimited in duration; here, by statute, compensation ($120 per week) will cease after five hundred weeks. Ind.Code § 22–3–3–8, *supra* ; Ind.Code § 22–3–3–10, *supra.*

The proposition that the spouse's employment, which constitutes the sole continuing income for the couple, must be foresaken is

---

2. The question whether the award should include extraordinary nursing services rendered by Talas's wife has not been argued here.

so at odds with the spirit and purposes of the Act that it must be rejected.

Consequently, we conclude that Talas is entitled to an award of the expenses necessary to employ nonprofessional nursing care of the nature rendered by Mark Jackson. The award shall be computed from May 13, 1979;[3] the weekly scope of the award shall equal the average number of hours Talas's wife is and was working per week, and the hourly rate shall be determined in accordance with Ind.Code § 22–3–3–5 (Burns 1974). Included within the award must be the medical expenses Talas incurs via periodic maintenance checkups at the hands of professional medical personnel, including a biweekly visit from a licensed nurse, who checks his blood pressure and catheter, and semiannual visits to the Rehabilitation Institute of Chicago for checkups. Dr. Sahgal indicated such services were the only professional care Talas required.

 Talas also sought recovery for various other expenses incurred for treatment by doctors, prescription drugs, and medical equipment; in support of his contention, he introduced copies of numerous unpaid bills which, "to his knowledge," had resulted from his condition. The Industrial Board denied his claim for these expenses on the basis that Talas had failed to prove the expenses were necessary to limit or reduce his impairment. The record reveals neither Drs. Cooper nor Sahgal addressed the causal connection between Talas's injury and the medical expense or the question whether the treatment and supplies served to limit or reduce his impairment. The Industrial Board properly rejected Talas's claim insofar as these expenses were concerned, for Talas failed to sustain his burden of proof on every material element of his claim. *B. P. O. Elks, No. 209 v. Sponholtz,* (1969) 144 Ind.App. 150, 244 N.E.2d 923; *Mathews v. Jim & Ed's Service Station,* (1964) 136 Ind.App. 28, 196 N.E.2d 282.

The administration of Talas's award remains within the jurisdiction of the Industrial Board. Ind.Code § 22–3–1–2 (Burns 1974). Its order that Talas "take nothing" on his petition is reversed and vacated, and the cause is remanded to the Board with instructions that, consistent with our decision, the Board calculate the award due Talas for both past and continuing medical expenses. The award shall remain subject to modification pursuant to Ind.Code § 22–3–3–27 (Burns 1974). *Gregg v. Sun Oil,* (1979) Ind.App., 388 N.E.2d 588.

The order of the Industrial Board is reversed and vacated; the cause is remanded for further proceedings not inconsistent with this opinion.

GIVAN, C. J., and DeBRULER, PRENTICE and PIVARNIK, JJ., concur.

---

3. Although Talas employed professional nursing care from May 13, 1979, to June 16, 1979, on a round-the-clock basis, the award shall be computed on the basis of the eight hour per day nonprofessional nursing care rendered by Jackson, for that was all that was necessary to limit his impairment, according to the evidence.