**JONES & LAUGHLIN STEEL CORPORATION, Appellant,**

v.

**Luther KILBURNE, Appellee.**

**No. 2–184A1.**

Court of Appeals of Indiana, Second District.

May 2, 1985.

Rehearing Denied June 7, 1985.

James E. Schreiner, Hammond, Ind., for appellant.

Samuel J. Furlin, Spangler, Jennings, Spangler & Dougherty, P.C., Merrillville, Ind., for appellee.

SULLIVAN, Judge.

The Industrial Board (Board), pursuant to I.C. 22–3–3–1 *et seq.* (Burns Code Ed. 1974), granted Luther Kilburne (Kilburne) compensation for injuries sustained in a work-related accident. Kilburne's employer, Jones & Laughlin Steel Corporation (J & L) appeals.

On February 8, 1981, Kilburne was employed as an acting foreman for J & L. He received serious injuries in the course of his employment when a shield weighing over ten tons fell on him. Kilburne's left leg was crushed which required it to be amputated above the knee. His right leg and hip were also crushed which resulted in a complete and permanent loss of their normal function. He also sustained a compression fracture of vertebrae and a number of broken ribs. The compression fracture and broken ribs, although healed as well as may be reasonably contemplated, cause Kilburne to suffer a radiating pain from the back, around and through the ribs. This radiating pain permanently limits Kilburne's use of his arms and makes it difficult to remain in any one position for a period exceeding two hours without pain medication.

Kilburne received fifty-two weeks of temporary total disability payments from J & L. These payments ceased, pursuant to Kilburne's request,[1] in March of 1982. J & L also provided Kilburne's medical care and pain medication during this time. Beginning July 31, 1981, Kilburne also received a permanent incapacity pension as provided in the union benefits plan. J & L also provided or offered Kilburne a number of items which would increase Kilburne's mobility and comfort. These items included:

(1) Two wheelchairs, one manual and one electric,

(2) A prosthetic device,

(3) An automobile equipped with manual controls,

(4) A portable toilet,

(5) New eye-glasses,

(6) A hospital bed equipped with a trapeze bar, and

(7) A wheelchair ramp up to the front door of Kilburne's residence.

The Board found that, as a result of his accident, Kilburne was totally and permanently disabled and had suffered ninety percent permanent partial impairment of the man as a whole. His condition was

---

1. Kilburne requested J & L cease his temporary total disability payments in order to avoid having to "pay back" any excess amounts. Kilburne made this request because he understood that if he was awarded a lesser amount under permanent disability than received in continued temporary total disability payments, he would be required to reimburse J & L.

found to have reached a permanent and quiescent state.[2]

The Board ordered J & L to reimburse Kilburne for pain medication as needed in the future and for travel expenses to be incurred in obtaining medical services and household necessities. The Board also found it to be J & L's responsibility to provide Kilburne with wheelchairs, a prosthesis, and special soft shoes; to install grab bars for Kilburne's bath and toilet; and to remodel Kilburne's house by building a ramp to the garage and enlarging his bathroom to accommodate a wheelchair. In addition, the Board awarded Kilburne five hundred weeks compensation for his disability and adjudged that J & L was not entitled to deduct Kilburne's pension benefits from his compensation award.

J & L presents the following issues for review which may be restated as follows:

(1) Whether J & L is entitled to set off the workmen's compensation award against the amount it pays pursuant to the union established permanent disability pension plan,

(2) Whether the Act permits the Board to award noncurative relief which tends to reduce the extent of the permanent partial impairment,

(3) Whether the award requires J & L to reimburse Kilburne for medical expenditures incurred prior to the date of the hearing, and

(4) Whether the findings, conclusions and award are sufficiently specific so as to permit meaningful review.

## I.

J & L contends that it should be permitted to credit the pension plan payments against the award. J & L and the United Steelworkers Union negotiated a benefits package which includes a permanent disability pension. This pension plan is funded entirely by J & L and is administered by a Pittsburgh bank. J & L is also a duly registered and authorized self-insurer for purposes of workmen's compensation.

Neither party contests Kilburne's right to receive the pension. The dispute centers upon the applicable deductions available to J & L. Section 3.10 of the pension plan, entitled "Deduction for Disability Payments," states, in pertinent part:

"Any amount paid to or on behalf of any participant on account of injury or occupational disease incurred in the course of his employment by the Company or any other employer causing disability in the nature of a permanent disability, whether pursuant to Workers' Compensation, Occupational Disease or similar statutory law ... shall be deducted from or charged against the amount determined in accordance with [this contract]; provided, however, ... that *any payments received by the participant under such laws shall not be deducted from any such amount for permanent incapacity retirement payable prior to age 65....*" Record at 533. (Emphasis supplied)

J & L advances three reasons why it should be able to reduce Kilburne's workmen's compensation benefits by the amount Kilburne receives from his pension. First, J & L argues that because it completely funds both compensation programs, and because payment from both programs depends upon the same injury to Kilburne, disallowing a credit or deduction results in double recovery in contravention of the Workmen's Compensation Act and public policy. Second, J & L argues that the pension payments are merely advancements to the employee of any future workmen's compensation award. Third, J & L

---

2. Although the Board recited that one doctor had concluded that Kilburne's condition had reached a permanent and quiescent state as of a medical examination on July 5, 1982, the Board did not find such to be the fact. The Board merely found that the permanent and quiescent state was reached at some time "prior to the date of hearing." (Record at 49). The hearing took place on January 19, 1983. For our purposes, therefore, we may only conclude that the permanent and quiescent state was achieved on that date. Kilburne focuses upon June 28, 1983, the date of the award as the pivotal date in this regard. By reason of our determination we need not and do not address the significance of this factor.

argues that I.C. 22–3–3–11 [3] makes workmen's compensation and any private pension plan mutually exclusive; thereby, when Kilburne requested his pension benefits he "refused employment" and removed himself from workmen's compensation eligibility. Each of these arguments is without merit.

■ Initially, J & L relies upon *Freel v. Foster Forbes Glass Co.* (1983) 1st Dist., Ind.App., 449 N.E.2d 1148, to support its argument that full payments from both the pension and the compensation plans contravenes public policy. The employee in *Freel* received his regular wages during his disability pursuant to the employer's wage continuation plan. The contract failed to mention whether the wage continuation funds should be credited against any workmen's compensation awards. The court noted that both the wage continuation and the workmen's compensation plans were entirely employer-funded, that the tax consequences to the employee were the same whether he received the funds as continued wages or as workmen's compensation, and that, if a credit were *not* given, the employee would receive more compensation than his regular wage. Therefore, failure to credit the wage continuation benefits against the workmen's compensation award would, according to the court, be inconsistent with the purposes of the Workmen's Compensation Act. *Freel* is clearly distinguishable in that J & L's contract clearly intends for the injured employee to receive both the pension and workmen's compensation until he or she reaches 65 years of age. Furthermore, unlike the injured employee in *Freel*, Kilburne will not receive an amount greater than his regular salary if J & L pays him both his workmen's compensation award and his pension benefits.[4] *Accord, Underhill v. Central*

*Hospital for the Insane* (1917) 66 Ind.App. 44, 117 N.E. 870.

J & L also relies upon *United Toolcraft v. Sousley* (1958) 128 Ind.App. 181, 147 N.E.2d 558. In *United Toolcraft* the employee received payments from the employer's group insurance policy under the mistaken belief that he was ill but not injured. The court addressed the question whether the receipt of sick pay prohibited the employee from seeking workmen's compensation. *United Toolcraft, supra,* 147 N.E.2d at 561. The court held it did not. *Id.* The employee in *United Toolcraft* did not contest the Board's decision to credit the sick pay received against the workmen's compensation award and the court did not address the issue. The exact nature of the sick benefits plan in *United Toolcraft* is unclear. Therefore, the decision does not support J & L's position.

■ J & L's contention, that compensation for the same injury from two separate funds is against public policy as a double recovery, is in error. An employer's workmen's compensation obligations are not extinguished because an employee receives compensation from another source. *Shelby Mfg. Co. v. Harris* (1942) 112 Ind.App. 627, 44 N.E.2d 315 (*en banc*). This is true even though the second source is an employer-funded program. The J & L pension plan is a bargained for employment benefit intended to supplement workmen's compensation; therefore, any pension payments are in fulfillment of J & L's contractual obligation, separate from its workmen's compensation obligation. 4 Larson, *Workmen's Compensation* §§ 97.51, 97.53; *Beatrice Foods Co. v. Clemons* (1974) 54 Ala.Civ.App. 150, 306 So.2d 18; *Southwestern Bell Telephone Co. v. Siegler* (1966) 240 Ark. 132, 398 S.W.2d 531; *Vero v. Sacramento City Employees' Retirement*

---

**3.** I.C. 22–3–3–11 states that:

"If an injured employee, only partially disabled, refuses employment suitable to his capacity procured for him, he shall not be entitled to any compensation at any time during the continuance of such refusal unless in the opinion of the industrial board such refusal was justifiable."

**4.** The workmen's compensation award gives Kilburne $140 each week. The pension plan gives him an additional $587.60 each month. Kilburne's average weekly income at the time of the accident was $845. Therefore, Kilburne receives, approximately, one-third of his prior income from these two plans, combined.

*System* (1940) 41 Cal.App.2d 482, 107 P.2d 82; *Brown v. S.S. Kresge Co.* (1974) Fla., 305 So.2d 191; *Belle v. General Electric Co.* (1982) Fla.App., 409 So.2d 182; *Beneteau v. Detroit Free Press* (1982) 117 Mich.. App. 253, 323 N.W.2d 498; *Cole v. Armour and Co.* (1977) Minn., 257 N.W.2d 381; *Evans v. Missouri Utilities Co.* (1984) Mo. App., 671 S.W.2d 812, *trans. denied; Novotny v. City of Omaha* (1980) 207 Neb. 535, 299 N.W.2d 757; *City of Corpus Christi v. Herschbach* (1976) Tex.Civ.App., 536 S.W.2d 653. The Board correctly refused to deduct the pension payments from Kilburne's workmen's compensation award.

■ J & L's second argument, that the pension payments were merely advancements toward Kilburne's compensation award, also must fail. The pension program is never referred to as an advancement in the contract, and we will not construe it as such. *Southwestern Bell Telephone Co. v. Siegler, supra,* 398 S.W.2d 531. Furthermore, had the pension plan been designed as a system of advancements it would have terminated upon the receipt of a compensation award, not upon the recipient's death, and the plan would not preclude credits for any compensation awards to recipients who are younger than 65.

Finally, J & L argues that by requesting his pension benefits Kilburne has refused procured employment under I.C. 22–3–3–11. (Burns Code Ed.1971). Therefore, J & L contends it is entitled to a credit for the pension payments. J & L misinterprets I.C. 22–3–3–11.

■ Under I.C. 22–3–3–11, an employer is permitted to reduce its workmen's compensation obligation by procuring for the injured employee employment by which he can earn some wages without injury to himself. *Bruce v. Stutz Motor Car Co. of America, Inc.* (1925) 83 Ind.App. 257, 148 N.E. 161. If the injured employee refuses the procured employment the employer's workmen's compensation obligation is suspended unless the Board determines that the refusal was justified. *Silvey v. Panhandle Coal Co. No. 5* (1927) 86 Ind.App.

111, 154 N.E. 778 (*en banc*). Until suitable employment has actually been procured by the employer and refused by the employee I.C. 22–3–3–11 does not apply. *Bruce, supra,* 148 N.E. at 163. Furthermore, I.C. 22–3–3–11 only applies where the employee is partially disabled. Kilburne is totally disabled and the mere request for pension benefits does not constitute a refusal to be otherwise employed. Therefore, I.C. 22–3–3–11 is wholly inapplicable.

## II.

The next issue for our resolution is whether the Board may award prospective non-curative relief to an injured employee.

The prospective relief ordered by the Board included costs of "necessary assistance" to get "from place to place," to his doctors and for normal necessities, pain medication and medical treatment, purchase and maintenance of wheelchairs, a ramp, grab bars, bathroom remodeling, special shoes and a prosthesis, if necessary. J & L argues that prospective relief may not be awarded under Indiana's Workmen's Compensation Act unless it will reduce the permanency of Kilburne's injuries. In support of this argument, J & L relies upon the text of I.C. 22–3–3–4, which reads, in pertinent part:

"If after an employee's injury has been adjudicated by agreement or award on the basis of permanent partial impairment ... the industrial board may ... require that treatment by such physician and other medical services and supplies be furnished by and on behalf of the employer as the industrial board may deem *necessary to limit or reduce the amount and extent of such impairment.*" (Emphasis supplied)

■ This code section clearly speaks of limiting or reducing the amount and extent of the impairment, not reducing the permanency of that impairment. *See Mousley v. Curry* (1954) 124 Ind.App. 280, 117 N.E.2d 280. "Impairment," within the context of the Workmen's Compensation Act, refers to the employee's loss of physi-

cal function(s) as a result of the injury. *Talas v. Correct Piping Co., Inc.* (1982) Ind., 435 N.E.2d 22, and cases cited therein. Therefore, this code section permits awards which will limit or reduce the extent or effect of Kilburne's loss of physical function. As was explained in *Gregg v. Sun Oil Co.* (1979) 3d Dist., 180 Ind.App. 379, 388 N.E.2d 588, 589:

> "The legislature, cognizant of the fact that a permanent impairment oftentimes requires continuing medical treatment, also provided that medical expenses incurred by the employee subsequent to the original award could be imposed on the employer."

*See also Talas, supra,* 435 N.E.2d 22. Board awards may, theoretically, be unlimited in duration and amount. *Gregg, supra,* 388 N.E.2d at 591, n. 5. Therefore it was not improper for the Board to award prospective relief which would tend to limit the extent or effect of his impairment.

J & L argues, however, that the Indiana Supreme Court's decision in *Talas, supra,* limits the grant of any prospective non-curative relief to unique and compelling factual situations. In *Talas* the court reversed the Board's *denial* of prospective benefits to a quadraplegic who, without the award, would be prone to life threatening medical disorders. J & L is correct that the court in *Talas* described the situation as unique and warned against any unwarranted extension of the decision. However, the *Talas* court was faced with reversing a Board determination that an employee was ineligible for benefits. The *Talas* court was necessarily hesitant to review and reverse a decision which, by legislative intent, had been delegated to the Board's expertise. It is in that respect that the court meant for its interpretation of I.C. 22–3–3–4 in *Talas* to be carefully applied. *Talas* does not, therefore, preclude this award of this prospective relief to Kilburne.

It may be further noted that the court in *Talas, supra,* focused upon the fact that the award would tend to protect against a worsening of the physical condition and against future medical complications. This aspect was also present in the Board's award to Kilburne. Added mobility increases Kilburne's ability to fend for himself, particularly in an emergency situation. In this sense, *Talas* supports the award in the case before us.

### III.

The parties dispute the meaning of that part of the Board's order which dealt with Kilburne's personally incurred expenses. The Board clearly listed "[w]hether the Plaintiff should be reimbursed for medical expenses which were paid by Plaintiff" as an issue to be resolved. The Board found that "all statutory medical services and supplies have been paid to date." Yet, it is undisputed that certain expenditures made by Kilburne for pain medication, treatment and other related supplies and services prior to the date of the hearing were not reimbursed by J & L.

It is impossible to tell from the record whether the Board's determination in this regard was in any way affected by the termination of the period of Kilburne's temporary total disability vis-a-vis the date his condition reached a permanent and quiescent state. (*See* I.C. 22–3–3–4, *supra,* and footnote 2, *supra*).

J & L argues that these parts of the Board's order mean that no medical debts Kilburne personally incurred prior to the hearing date need to be reimbursed. Kilburne argues that such an interpretation would be inconsistent with the rest of the Board's award ordering J & L to reimburse him for the same type expenses incurred after the hearing. Therefore, Kilburne contends that the Board's award must be read to require J & L to reimburse him for those expenses he personally incurred between the end of his temporary benefits and the hearing.

Mr. Crnarich, J & L's workmen's compensation administrator, testified that J & L stopped paying for any pain medication in the spring of 1982. J & L did not pay these expenses because the treating company doctor said pain medication was unnecessary, and because the company doctor

said that the treatment Kilburne requested would not reduce his impairment. J & L did not pay certain ambulance costs because it felt the Workmen's Compensation Act required payment only for out of county trips. The evidence thus indicates that the bills Kilburne testified to were not paid by J & L.

■ We are unable to glean from the record any insight into the meaning and intent of the Board with regard to the reimbursement issue. It is possible that the Board reasoned that those prior expenditures were not necessary; it is possible that the Board reasoned that I.C. 22–3–3–4 precluded such reimbursement; it is possible that the Board intended such reimbursement to be made by implication of its award with regard to future similar or identical expenditures; and it is also possible that the matter was not covered through mere oversight or inadvertence. Be that as it may, we are unable to resolve this issue. It must be the subject of the Board's consideration or reconsideration upon remand.

### IV.

In a somewhat similar vein we are asked to review various specific aspects of the award. Because those specific aspects of the award are not accompanied by a finding of the underlying facts nor by a statement of reasons, we are unable to give meaningful review.

■ The Board, in addition to the permanent disability compensation, awarded Kilburne continuing reimbursement for future pain medication and treatment by his family physician. Under I.C. 22–3–3–4 injured employees are not entitled to choose their own physician unless (1) an emergency exists; (2) the employer fails to provide the needed medical care; or (3)

other good reason exists. *Richmond State Hospital v. Waldren* (1983) 2d Dist., Ind. App., 446 N.E.2d 1333, 1334.[5] Although the Board determined that it was necessary for Kilburne to be seen by his family physician it failed to make findings or to state the reason for that conclusion.

■ Absent findings or a statement reflecting the Board's rationale for that part of the order that part of the award can not be adequately reviewed. *Indiana Bell Telephone Co., Inc. v. Owens* (1980) 4th Dist., Ind.App., 399 N.E.2d 443.

■ The Board's award of pain medication deemed necessary to limit the extent of Kilburne's impairment is similarly unsusceptible to meaningful review.

The Board also ordered J & L to reimburse Kilburne at a

"reasonable rate for all necessary assistance rendered ... to get from place to place, to his doctors, for treatment and for normal necessities." Record at 49.

While the Board's findings suggest that "normal necessities" refer to in-home assistance, it is far from clear what form this assistance should take. The use of the terms "reasonable rate," "all necessary assistance," and "from place to place" are also too vague. The Board's findings must support the declarations that such an award serves to limit the extent or effect of Kilburne's impairment and the award must be sufficiently specific to permit review. Consequently, this part of the Board's award is also reversed.

■ The Board also awarded Kilburne a continuous supply of wheelchairs, a ramp from his garage to his house, grab bars for his bath and toilet, an extension of his bathroom, and special soft shoes.[6] Although a search of the record may disclose evidence sufficient to justify these conclusions, or some of them, the Board has not

---

**5.** No issue is presented with respect to whether these limitations are applicable both before and after an adjudication of permanence. *But compare Richmond State Hospital, supra,* and *Jos. E. Seagram & Sons, Inc. v. Willis* (1980) 3d Dist., Ind.App., 401 N.E.2d 87 (both dealing with medical treatment prior to adjudication) with

*Roush v. W.R. Duncan & Son* (1933) 96 Ind.App. 122, 183 N.E. 410 (affirming denial of a claim of medical services after adjudication).

**6.** The remainder of the Board's award is not contested.

provided its rationale, either factual or legal, for those severable award items as to necessity or otherwise.

The award is affirmed as to the compensation ordered without deduction or credit for pension benefits and it is affirmed to the extent that it approves the concept of prospective medical treatment, services and supplies which will limit or reduce the amount, extent or effect of the permanent impairment. The award is otherwise reversed and the cause is remanded for further proceedings not inconsistent herewith.

BUCHANAN, C.J., and SHIELDS, J., concur.