Russell ROEBEL, Appellant–Plaintiff,

v.

DANA CORPORATION, Appellee–Defendant.

No. 93A02–9402–EX–41.

Court of Appeals of Indiana,
First District.

Sept. 6, 1994.

Edward L. Murphy, Jr., Diana C. Bauer, Miller Carson Boxberger & Murphy, Fort Wayne, for appellant.

Carolyn W. Spengler, Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, for appellee.

ROBERTSON, Judge.

Russell Roebel appeals the denial of his claim for Worker's Compensation benefits. He asks that we reverse the decision of the

Worker's Compensation Board and award him temporary total disability benefits from October 4, 1988 to December 18, 1988, and permanent total disability benefits commencing June 1, 1989. We affirm the Board's denial of benefits.

The parties have stipulated that Roebel, an employee of Dana Corporation, took early retirement from Dana on June 1, 1989. At that time, Roebel had been with Dana for a period of approximately forty-two years, the last year and one-half spent as an inspector of the rings and pinions produced by departments 131 and 151.

Roebel began to complain that he had been the subject of either harassment or a series of practical jokes, including the placement of water in his sponge rubber seat, bluing in his jacket and cigarette butts at his work station, within two weeks of assuming the inspector's position. According to Roebel, the incidents of harassment occurred with frequency. Dana's quality control supervisor testified that Roebel complained every two to four weeks. Even so, Dana officials could not identify the perpetrator. At least twice, Dana offered to move Roebel to an inspector's position with another department but Roebel viewed his acquisition of this particular inspector's position as something he had achieved by virtue of his seniority and he refused to be transferred.

Roebel worked a considerable amount of overtime right up to his retirement. According to his supervisors, he was an excellent inspector and was very much able to perform his job until the day he left.

On October 3, 1988, Roebel did not go home but slept in his car at Dana. The following day, October 4, 1988, Roebel took a leave of absence from his position at Dana and did not return to work until December 20, 1988. During that time, Roebel entered hospitalization programs at two separate facilities for treatment related to depression and stress and his wife sought to dissolve their marriage. His medical records from those facilities contain reports of marital discord, but no direct reference whatsoever to the incidents of harassment.

Roebel left his employment at Dana without communicating to anyone that he had decided to retire because he could no longer tolerate the pranks. Dana first learned of Roebel's claim of disability in September, 1989, when Roebel's wife notified Dana's occupational health nurse that a completed worker's compensation claim form would be arriving in the mail. Dana had no advance notice of Roebel's hospitalizations or his claim that he had obtained treatment for stress related to the incidents of harassment. Roebel represented at the time he notified Dana of his intent to retire that things in the plant were going well yet he intended to retire anyway.

■ To obtain worker's compensation for the periods in question, Roebel must sustain his burden of proof upon every element of his claim. *Talas v. Correct Piping Co.* (1982), Ind., 435 N.E.2d 22, 31; *Indiana & Michigan Electric Co. v. Morgan* (1986), Ind.App., 494 N.E.2d 991, 994, *trans. denied.* Among the single hearing member's findings of ultimate fact, which were adopted by the Board, are the findings that Roebel failed to show by a preponderance of the credible evidence that he was totally disabled at any time, as a result of any work-related injury, and that he failed to show by a preponderance of the credible evidence that he suffers from a permanent total disability, due to any injury arising out of and in the course of his employment with Dana.

■ As claimant, Roebel bore the burden of proving the existence of a permanent total disability. *Rork v. Szabo Foods* (1982), Ind., 439 N.E.2d 1338, 1341; *Perez v. U.S. Steel Corp.* (1981), Ind., 428 N.E.2d 212, 216. He therefore appeals from a negative judgment. In our review of that judgment, we do not weigh the evidence nor judge the credibility of witnesses. Rather, we examine the record only to determine whether there is substantial evidence and reasonable inferences which can be drawn therefrom to support the Board's findings and conclusion. If there was competent evidence of probative value to support the Board's findings, we will affirm.

*Hansen v. Von Duprin, Inc.* (1987), Ind., 507 N.E.2d 573, 576. Only if the evidence is of such a character that reasonable persons would be compelled to reach a conclusion contrary to the decision of the Board will it be overturned. *Perez,* 428 N.E.2d at 216.

▪ Where the evidence of expert witnesses is conflicting, it is the Board's prerogative to resolve the conflicts. We cannot impinge upon the Board's resolution of these questions. *Id.; Rockwell International v. Byrd* (1986), Ind.App., 498 N.E.2d 1033, 1037. The Board's findings are conclusive and binding as to all questions of fact. *Perez,* 428 N.E.2d at 215; I.C. 22-3-4-8.

▪ The term "disability," as used in the Worker's Compensation Act, is a word of art; it connotes an injured employee's inability to work. *Rork,* 439 N.E.2d at 1343. To be permanent, a total disability must be one which so destroys a worker's wage earning capacities as to leave him unable to resume reasonable types of employment for the remainder of his life. *K-mart Corp. v. Morrison* (1993), Ind.App., 609 N.E.2d 17, 29 (quoting P. Small, Workmen's Compensation Law § 9.4, p. 244 (1950)), *trans. denied.* Therefore, to establish a "permanent total disability," the injured worker is required to prove he or she cannot carry on reasonable types of employment. *Perez,* 428 N.E.2d at 215–6; *Morrison,* 609 N.E.2d at 29. The "reasonableness" of the worker's opportunities are to be assessed by his physical and mental fitness for them and by their availability. *Perez,* 428 N.E.2d at 216.

▪ The medical evidence offered on Roebel's ability to hold gainful employment came from three sources: Dr. Robert Green, a psychiatrist who had diagnosed and evaluated Roebel's mental condition on behalf of Dana following Roebel's retirement; Dr. John A. Egli, Roebel's family physician, who had treated Roebel for stress prior to Roebel's admission to Oaklawn Psychiatric Center; and Dr. Gerald Kauffman, the psychiatrist practicing with Oaklawn Psychiatric Center where Roebel had been hospitalized for thirty days in late 1988. Dr. Green diagnosed Roebel's condition as dysthymia, a form of depression which is virtually lifelong, but also opined that there was a strong possibility that Roebel suffered from organic brain disease, possibly frontal lobe atrophy, a form of dementia with memory impairment. In Dr. Green's opinion, neither condition had been caused by any of the situations which occurred at Dana. In any case, Dr. Green acknowledged that depression can affect a patient to the point of becoming disabled, that it does require treatment, and that at the time of his assessment, Roebel's condition was of such a nature as to prevent him from returning to his job.

However, because Roebel had not received the appropriate treatment for his condition, either from Dr. Egli or Dr. Kauffman, Dr. Green believed it would be premature to conclude that Roebel's condition had become permanent without a trial of adequate medication and counseling. If Roebel returned to his former job, and with the right medication, still could not function, he should be given the opportunity to move to a job with less stress. In Dr. Green's view, the job stressor could have been effected by modifying Roebel's job assignment. Hence, Dr. Green's testimony provides evidence from which the Board could conclude that Roebel was not in fact disabled, or if disabled, not permanently and totally disabled at the time of his retirement.

In an effort to establish that he suffered from a permanent total disability, Roebel placed in evidence the opinions of Dr. Kauffman and Dr. Egli. As noted in the Board's findings, the testimony of Dr. Green elucidates several reasons for the Board to accord little weight to the opinions of Dr. Kauffman and Dr. Egli, among them, the absence of any mention in any of the paperwork generated by the Oaklawn Psychiatric Center of the incidents of harassment and their effect upon Roebel's condition; Dr. Kauffman's use of the Diagnostic and Statistical Manual–III–Revised as a means of diagnosing Roebel's condition yet his failure to incorporate into his assessment all of the axes intended by

the DSM–III–R to be considered in a diagnosis; Dr. Kauffman's failure to supervise or provide any form of treatment following Roebel's discharge from the center; and the prescription of medication for Roebel which Dr. Green opined to be wholly inappropriate.

Dr. Kauffman diagnosed Roebel's condition at the time of his discharge from Oaklawn Psychiatric Center as an adjustment disorder with mixed disturbance of emotions and conduct, and also concluded that Roebel suffered from a dependent personality disorder with prominent passive-aggressive and paranoid traits. Apparently, Dr. Kauffman did not modify his diagnosis subsequently when he assessed Roebel's condition for purposes of this claim. Dr. Egli opined that Roebel was "suffering from a number of problems, including some organic brain disease."

When the evidence from Dr. Kauffman and Dr. Egli which is most favorable to the Board's determination is considered, we observe these doctors too did not conclude that Roebel was permanently totally disabled as those terms are employed in the Worker's Compensation Act. Dr. Kauffman stated during his deposition that Roebel's condition "will become permanent if he is not provided with some type of psychiatric help or psychological counseling." (R. 786–7). Although Dr. Egli opined that Roebel's condition had reached a quiescent state, he also stated that "given adequate support at the workplace, [Roebel] probably could have maintained some functional level within his workplace." Dr. Egli did not know what that level would have been.

Dr. Egli also stated that he was not sure he was qualified to answer the question of whether Roebel could return to gainful employment; he stated that "given the stress in the workplace, aside from any harassment, [Roebel] was probably unable to adequately rationalize in a fashion that would result in gainful employment." Dr. Egli went on to say that it "would be beyond [his] opinion" to testify that he (Dr. Egli) did not believe Roebel could return to the job that he had in any condition, whether he was being ha-

rassed or not. Whether Dana could hire him in a fashion that would be adequate, Dr. Egli did not know. Thus, Dr. Kauffman opined that Roebel's condition was not yet permanent at the point he assessed Roebel for purposes of this claim while Dr. Egli could not say that Roebel had become disabled as defined for purposes of the Worker's Compensation Act.

The record also contains the testimony of several of Roebel's colleagues at Dana refuting Roebel's claim that at the point at which he retired, he appeared to be suffering from a permanent total disability. This evidence is cited by the Board in its findings. Roebel's supervisors testified that Roebel capably performed his responsibilities at Dana in February, 1989, and until the day he left. (R. 448, 548). Roebel himself testified that in the spring of 1989, he was not having any difficulty performing his job as an inspector. (R. 317). Dana's human resources director testified that Dana never received any kind of letter or report from either Roebel or any one else, indicating that Roebel had become disabled by reason of his work at Dana at the time he retired in June, 1989, and Roebel did not offer any evidence that he sought medical treatment for his mental condition following his release without restriction from the hospital in December, 1988. Roebel volunteered to work up to 16 hour days, six to seven days per week. He refused on at least two occasions to be transferred to a less demanding inspector's position, away from the individuals he believed to be harassing him.

As in *Perez*, Roebel rested his claim upon the medical evidence of his incapacity; he offered no other independent evidence on the availability or lack thereof of other "reasonable types of employment." Dana offered Roebel other reasonable types of employment, after his hospitalization and before his retirement. Roebel turned those offers down without demonstrating that he could not perform them. Indeed, he left his last position at Dana without any notice, either verbally or through his conduct, that he was unable to function in his position. This being the case, and in the absence of medical evi-

dence pointing unerringly to the opposite conclusion, the Board could properly conclude that Roebel failed to prove by credible evidence that he suffers from a permanent total disability due to any injury arising out of and in the course of his employment with Dana.

The Board also found that Roebel failed to give timely notice, if he had suffered a work injury, and that Dana was not given the opportunity to provide appropriate medical evaluation and services to its prejudice. The Worker's Compensation Act contains the following provision concerning notice:

> Unless the employer or his representative shall have actual knowledge of the occurrence of an injury ... at the time thereof or shall acquire such knowledge afterward, the injured employee or his dependents, as soon as practicable after the injury or death resulting therefrom, shall give written notice to the employer of such injury or death.

> Unless such notice is given or knowledge acquired within thirty (30) days from the date of the injury or death, no compensation shall be paid until and from the date such notice is given or knowledge obtained. No lack of knowledge by the employer or his representative, and no want, failure, defect or inaccuracy of the notice shall bar compensation, unless the employer shall show that he is prejudiced by such lack of knowledge or by such want, failure, defect or inaccuracy of the notice, and then only to the extent of such prejudices.

Ind.Code 22–3–3–1.

■■■ An employer seeking to defend against the payment of a claim on the ground that he was prejudiced by lack of knowledge or defective notice of his employee's injury has the burden of proof to show such lack of notice or defective notice. *Bogdon v. Ramada Inn, Inc.* (1981), Ind.App., 415 N.E.2d 767, 770; *Pirtle v. National Tea Co.* (1974), 159 Ind.App. 597, 600, 308 N.E.2d 720, 722. Even if an employer shows lack of notice, compensation is not barred unless the employer can show he was prejudiced. Where prejudice is shown, the employees' right to compensation is barred only to the extent of prejudice. *Bogdon,* 415 N.E.2d at 770; *Pirtle,* 308 N.E.2d at 722.

■■ The record establishes without conflict in the evidence that Dana did not receive any written or oral notice of Roebel's worker's compensation claim, either as to his claim for temporary total disability for the period of time he was hospitalized or of his claim of permanent total disability, until about four months after Roebel's retirement. At no time did Roebel expressly state that he perceived himself to have been injured by reason of the work environment at Dana or give anyone any reason to suspect that he was suffering emotionally to such an extent that he could no longer work. Roebel did not appear to manifest any symptoms of injury, and Roebel made no showing that anyone at Dana had any knowledge of his pre-existing nonoccupational susceptibility to anxiety and depression. Moreover, there was no single precipitating event which might have been identified by Dana as producing Roebel's injury.

Dana did know of Roebel's concern about the pranks he believed others to be playing upon him prior to his hospitalization but not of their effect upon Roebel. Roebel himself was a prankster, and the horseplay occurred fairly routinely in the plant. Roebel also routinely complained about the work, in particular, that his supervisor bought too many of the rings and pinions he had tagged as varying beyond the established tolerances.

About a month before Roebel's hospitalization, his complaints led the human resources director to call a meeting with Roebel, union representatives, and Jack Traxler, the "lead man" in department 151, whom Roebel suspected to be the perpetrator of the pranks played upon him, to put an end to the horseplay. Traxler denied that he was harassing Roebel; like Roebel, Traxler had been with Dana for thirty years. Dana could not identify the perpetrator, and it was not about to terminate a union employee without proof. Both employees were warned to put an end to the horseplay.

During the month following the meeting, Roebel reported no new incidents and to his supervisor, it appeared that the matter had resolved itself. Roebel continued to perform his job and to work overtime. Immediately before he was hospitalized, Roebel reported to his colleagues that all was not well at home and appeared at work wearing a style of clothing he ordinarily did not wear. When he learned of Roebel's hospitalization, Roebel's immediate supervisor believed the hospitalization to have come about because of marital difficulties. This impression apparently was not dispelled by conversations with Roebel's wife. The documentation from Roebel's hospitalizations did not mention the incidents of harassment as one of Roebel's complaints; it did identify marital discord as one of the precipitating factors in Roebel's hospitalization. And, Roebel was released from treatment to return to work without any restrictions. Consequently, even when Roebel's depressed condition did manifest itself, Dana still did not have notice that Roebel or any of his physicians believed his condition to be work-related.

After Roebel's return, Roebel refused Dana's efforts to alleviate any tension inherent in his position as inspector by moving him to another inspector's position in another area of the plant. At the time he formally announced his retirement, Roebel denied that he was forced to retire by reason of the job conditions, and again refused a transfer in lieu of retirement. Hence, Roebel actually led his employer into believing that he intended to treat his depression, or any aggravation of it, as nonoccupational.

Upon this evidence, the Board could reasonably conclude that Dana did not have actual notice of Roebel's injury, particularly for the period of hospitalization for which he maintains he is entitled to temporary total disability payments, and that Dana was prejudiced thereby. The medical evidence offered from Dr. Green established that Roebel suffered from dysthymia, a depression, which, if compensable as an injury by accident at all in this case, is compensable by reason of its aggravation. *See generally,*

*Hansen,* 507 N.E.2d 573. Roebel's failure to give Dana actual notice of his injury precluded Dana from taking any action with respect to Roebel's condition, either to immediately alleviate the stress experienced by Roebel which was attributable to the workplace by putting Roebel into a different kind of employment or by obtaining appropriate medical treatment for him. Dr. Green testified that Roebel had not had appropriate medication prescribed for him; Dana was never given the opportunity to investigate how Roebel might function in his job with proper medication. In short, Roebel's failure to give notice of the injury sustained by him precluded Dana from removing the workplace as a contributing cause of Roebel's disability; further aggravation of Roebel's condition might have been prevented and disability forestalled. The Board's conclusion that Dana has proven it has been prejudiced by Roebel's failure to give notice is amply substantiated by the record.

We find no ground for reversing the denial of temporary or permanent total disability benefits. The Board's findings in support of its denial of benefits are supported by the evidence of record.

Decision affirmed.

NAJAM and STATON, JJ., concur.