### K–MART CORPORATION, Appellant–Defendant,

v.

### Jo Ann MORRISON, Appellee–Plaintiff.

### No. 93A02–9204–EX–172.

Court of Appeals of Indiana, Third District.

Feb. 24, 1993.

Transfer Denied May 21, 1993.

**18** 

Douglas F. Stevenson, Chicago, for appellant-defendant.

Timothy J. Walsh, South Bend, for appellee-plaintiff.

GARRARD, Judge.

This is an appeal from an award of the Worker's Compensation Board in favor of Jo Ann Morrison.

FACTS AND PROCEDURAL HISTORY:

Jo Ann Morrison ("Morrison") was involved in a work related accident on October 9, 1986, at the K–Mart store in Warsaw, Indiana. Morrison was working in the apparel stockroom when approximately 15 boxes of clothing fell and struck her on the head, shoulder, neck, back and leg. After receiving initial medical attention, Morrison sought additional treatment from a K–Mart doctor and was referred to Dr. Schneider by her immediate supervisor, Chris Owens. After this, Morrison stated that she wanted to see another doctor and, because she knew that K–Mart had to direct where she went, sought approval from Owens. Owens approved Dr. Rose, an orthopedist, and Morrison continued treatment. Several other doctors were also consulted with K–Mart's approval but with little improvement in Morrison's overall condition. Finally, on the recommendation of a friend and without K–Mart's prior knowledge, Morrison went to see Dr. Johnson, an orthopedist in Indianapolis. Dr. Johnson was of the opinion that Morrison might be suffering from Reflex Sympathet-ic Dystrophy (RSD), a little known but potentially debilitating condition affecting the sympathetic nervous system. After this visit, Morrison informed Owens of the visit and testified at the hearing that Owens said "he understood" and that she "could do what had to be done." Dr. Johnson gave Morrison medical leave slips that she turned in to K–Mart. Up to this point K–Mart had paid all medical bills submitted to it by Morrison.

In March, 1988, Morrison took a leave of absence from working at K–Mart. She did, however, continue to work as needed at her husband's towing business, answering the phone and handling advertising for several hours, four or five days a week.

In April, 1988, Morrison stopped seeing Dr. Johnson and apparently went without medical attention until August 28, 1988. At that time Morrison went to see Dr. Edwards, an anesthesiologist and professional advisor to the RSD Association. Dr. Edwards was recommended to her by a friend and Morrison made an appointment with him after attending a lecture that he had given. Dr. Johnson later wrote a letter of referral to Dr. Edwards at Morrison's request. Dr. Edwards diagnosed Morrison as suffering from RSD and treated her using stellate blocks and medication. During this period Morrison submitted many of her medical bills to Blue Cross Blue Shield, K–Mart's insurance carrier for employee health benefits. Additionally, Morrison drew 26 weeks of disability benefits under K–Mart's Wage Protection plan from March, 1988 through September 13, 1988.

On January 16, 1989, Dr. Edwards released Morrison to return to work subject to three conditions: (1) she could lift no more than 10 pounds in weight, (2) she could not lift anything above shoulder level, and (3) she could not climb any ladders until further notice. On February 13, 1989, K–Mart responded by offering Morrison a job at the jewelry counter that met these qualifications and gave Morrison her schedule for the following week. Morrison, however, did not take the job, informing someone at K–Mart that the jewelry counter

was close to the doors and that she was sensitive to cold. K–Mart then terminated Morrison based on her refusal to return from her leave of absence.

In May, 1990, Morrison stopped seeing Dr. Edwards and has apparently received no medical care on a consistent basis since that time. In February, 1990, Morrison was referred by Dr. Edwards to Dr. Stanton–Hicks, an anesthesiologist, a member of the board of directors of the RSD Association, and a subspecialist in RSD. Dr. Hicks saw Morrison only once, but, after examining her and performing an evaluatory stellate block, diagnosed Morrison with RSD. Finally, in January of 1991 Dr. Edwards performed an infrared thermogram, a kind of heat photography, on Morrison which both Dr. Edwards and Dr. Hicks stated confirmed Morrison's diagnosis of RSD.

On April 2, 1987, Morrison filed her application for worker's compensation benefits and on April 9, 1991, a hearing was held before a single member of the Worker's Compensation Board (Board). The single member entered findings of fact and conclusions of law on October 5, 1991, and awarded Morrison 11-4/7 weeks of temporary total disability benefits at the rate of $97.33 per week, 500 weeks of permanent total disability at the rate of $75.00 per week, over $9,000.00 in medical expenses, and all statutory medical and hospital services and supplies as necessary to reduce or limit Morrison's permanent partial impairment. On request by Morrison's attorney, the single member corrected the award to reflect 500 weeks at the rate of $97.33 per week instead of the previous award of $75.00 per week. K–Mart appealed this corrected award to the full Board which affirmed the single member and reversed only as to the 11-4/7 weeks of temporary total disability.

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

ISSUES:

K–Mart presents seven issues for review which we restate as follows:

I. Whether infrared thermography is admissible evidence in Indiana (a) under the test set forth in *Frye v. United States* (1923), D.C.Cir., 293 F. 1013, and (b) in proceedings before the Worker's Compensation Board.

II. Whether there was sufficient evidence to support the Board's finding that Morrison suffered from RSD.

III. Whether there was sufficient evidence of the permanent or quiescent nature of Morrison's condition to support the Board's finding that Morrison was permanently totally disabled within the meaning of the Worker's Compensation Act.

IV. Whether Morrison justifiably refused a job offered to her by K–Mart that met restrictions set out in a work release authorized by Dr. Edwards.

V. Whether the Board erred in awarding Morrison over $9,000.00 in medical expenses.

VI. Whether the Board erred by failing to credit K–Mart with 26 weeks of disability payments paid to Morrison by Aetna, K–Mart's disability insurance carrier.

VII. Whether the single member erred in reopening the award of permanent total disability and adjusting the amount of compensation from $75.00 per week to $97.33 per week.

DISCUSSION:

Issue I:

K–Mart first challenges the admissibility of infrared thermography in Indiana (a) under the test set forth in *Frye v. United States* (1923), D.C.Cir., 293 F. 1013, and (b), if not admissible under *Frye*, would relaxed evidentiary standards allow its admission in proceedings before the Worker's Compensation Board.[1]

---

1. Morrison contends that this issue has been waived due to K–Mart's failure to object each time the thermogram was offered into evidence. The basis for this argument escapes us. After examining the record, we find that each time the thermogram was offered, either in a deposition or at the hearing, K–Mart objected in a timely and specific manner. In addition, K–

Thermography is a fairly recent development in the medical field. It is essentially "heat photography" which purportedly provides an objective means of measuring soft-tissue injuries and pain. *See Ferlise v. Eilor* (1985), 202 N.J.Super. 330, 495 A.2d 129, 130. The procedure measures differential skin temperature by recording the infrared light emitted by the body. The infrared temperature readings are then computerized graphically and depicted on a television screen. Injuries which result in inflammation, such as sprains and strains to muscles, cause dilation of the blood vessels in the involved area, resulting in the appearance of a warm spot which is recorded by the thermogram machine. *Id.*[2]

Dr. Edwards performed an infrared thermogram on Morrison in January of 1991 which was received into evidence before the Board. The Board found the evidence admissible: "Concluding that the thermogram has some reasonable degree of recognition and acceptability among the medical community, and in light of the relaxed rules of evidence, which the Worker's Compensation Board of Indiana now tends to allow, this relevant new scientific device is determined to be admissible." We disagree with the Board and in light of the following analysis we find that infrared thermography is inadmissible in Indiana.

### A. Admissibility of Infrared Thermography Under Frye.

■ Whether infrared thermography is admissible evidence in our courts is a question of first impression. In determining whether novel scientific evidence should be admissible in Indiana, our supreme court has consistently used a test put forth by the District of Columbia Court of Appeals in *Frye v. United States* (1923), D.C.Cir., 293 F. 1013. *See Hopkins v. State* (1991), Ind., 579 N.E.2d 1297; *accord Cornett v. State* (1983), Ind., 450 N.E.2d 498; *Peterson v. State* (1983), Ind., 448 N.E.2d 673. In *Frye*, the District of Colombia Court of Appeals, in excluding evidence of a "monograph" lie detector test, held that before admitting experimental scientific principles or discoveries into evidence:

> the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye, supra* at 1014 (emphasis added); *Hopkins, supra* at 1301. The holding in *Frye* can be broken into two components: 1) what is the "field", or how broad is the scientific community, in which thermograms belong, and 2) has the thermogram been sufficiently established to have gained general acceptance there.[3] We will ad-

---

Mart registered a continuing objection as follows:

> MR. STEVENSON: For the record, Your Honor, and in order to save time, whether thermography is admissible evidence has been the subject of [sic] quite a few courts have ruled upon. I want to state an objection to thermography, but right now it would be subject to the briefs we submit later on, and to save time, I won't object each time to thermography. I will have a continuing objection.
> COURT: Thank You. I appreciate that. (R. 608–09).

This issue was sufficiently preserved for review.

2. A more detailed description of infrared thermography is found in the record and is included here by way of further explanation:

> Infrared telethermography is a noncontact method of determining skin temperature. It is the principal system used for thermal imaging. The infrared scanning device converts radiated thermal energy into electronic signals that are amplified and transmitted to a video display monitor. The infrared scanning unit is composed of an infrared detector, an electro-optical scanning mechanism, and control electronics. Oscillating mirrors and prisms image 30,000 to 64,000 discrete points in the field of view; thus, when the electronic signal is displayed on the cathode ray screen, the resultant scan contains from 30,000 to 64,000 points of thermal information. At a camera-to-object distance of 50 cm, each point represents a precise temperature measurement encompassing a skin surface area of 1 mm.

*Thermography in Neurological and Musculoskeletal Conditions,* Informational Report of the [AMA] Council on Scientific Affairs (submitted to the AMA House of Delegates prior to the December 6–9, 1987 Interim meeting; received for information only).

3. In *Hopkins, supra* at 1302, our supreme court utilized a three prong analysis when determining if DNA identification testing would meet the requirements of the *Frye* test:

> "Prong I. Is there a theory, which is generally accepted in the scientific community, which supports the conclusion that DNA forensic testing can produce reliable results?

dress each of these components separately.[4]

First, when determining how broad the field, or scientific community, is in determining the admissibility of infrared thermograms, we look to *Cornett, supra* for guidance. In *Cornett,* our supreme court discussed the admissibility of voice spectrograms and whether the scientific community should be comprised only of those scientists who use voice spectrograms for voice identification, or whether the community should also embrace those scientists who use spectrograms for other purposes in connection with the human voice. The court opted for the larger group stating:

> Limiting the community to only the [smaller] group would be too narrow and misleading. It is natural, of course, that the people actively employing the new scientific process are urging its introduction into evidence. However, just as with hypnotically prompted evidence, it appears that only a small group of the same people testify again and again in order to get this evidence admitted. It appears that they have failed to convince their peers to join them in this crusade.

*Id.* at 503. In determining the "field" for the purposes of the admissibility of infrared thermography, therefore, we decide that it is best to use a broad segment of the scientific community and include all areas of the medical community that have examined thermography for possible application in their specialty.

Second, we look to see if infrared thermography has gained general acceptance in those medical specialties that have examined it. When determining general accept-

ability, we review 1) the testimony in the record, 2) the opinions of other jurisdictions, and 3) articles from law reviews and scientific journals. *Id.*

### 1. The testimony in the record.

The testimony in the record indicates that Thermography is not generally accepted in the medical profession at large and among those specialties and subspecialties that have evaluated it. For example, Dr. Hicks testified that the medical profession generally thinks of thermography only in relation to mammography or thermographic breast diagnosis. He also indicated that he was aware that thermograms were inadmissible in other courts because those courts felt that thermograms did not meet the standards of the medical profession, and that thermograms have been a matter of controversy in medical circles. Dr. Edwards testified, when asked if the American Academy of Thermography is a generally accepted medical specialty practice, "we will say no to answer that question." While Dr. Edwards testified that a dozen or so medical schools offer thermography as part of their curriculum, he stated that none offer it as a specialty. In addition, Dr. Edwards testified that thermography was not recognized by the medical profession as one of the 21 Board recognized specialties and acknowledged that thermography was not in the mainstream of medicine, that a majority of physicians had not as yet accepted it, and that probably less than a dozen use thermography in Indiana. While both Dr. Hicks and Dr. Edwards stated that thermograms are reliable and

---

Prong II. Are there techniques or experiments that currently exist that are capable of producing reliable results in DNA identification and which are generally accepted in the scientific community?
Prong III. Did the testing laboratory perform the accepted scientific techniques in analyzing the forensic samples in this particular case?"
*People v. Castro* (1989), 144 Misc.2d 956, 545 N.Y.S.2d 985, 987. This test breaks *Frye* into workable components for determining if DNA testing meets its requirements. This breakdown is helpful in determining if other novel scientific methodologies also meet the *Frye* test, but we find that much of this breakdown is repetitive

and unnecessary for the purpose of evaluating infrared thermography.

**4.** We decide these questions as a matter of law. *See Hopkins, supra* at 1302. As our supreme court stated in *Cornett, supra* at 503: "The trial court and jury should not, on a case by case basis, be called upon to resolve a conflict in the scientific community concerning the validity of a new scientific process. If the experts cannot agree about the reliability of a scientific technique, the courts should restrain its introduction because of potential harm and prejudice to the parties involved."

trustworthy diagnostic tools in the hands of someone who knows how to interpret them, we are persuaded that the weight of this testimony favors exclusion.

2. Articles from law reviews and scientific journals.

We are also persuaded that scientific literature will not support the view that thermography has gained general acceptance in the medical community. For example, a subcommittee of the American Academy of Neurology reported that "[b]ased on the present medical literature, infrared thermography has not been shown to provide sufficient reliable characterization information about neurologic dysfunction or deficit to accept it as a proven evaluative procedure for the clinical diagnosis or characterization of (1) neck or back pain ... (2) musculoskeletal pain...." *Assessment: Thermography in neurologic practice*, 40 Neurology 523, 524 (March, 1990). The American Academy of Orthopaedic Surgeons came to a similar conclusion. "While much has been published both for and against the use of thermography, a review of the literature indicates a lack of specificity, reliability and reproducibility for this technique. The American Academy of Orthopaedic Surgeons believes that the use of thermography as a clinically

useful diagnostic or prognostic test cannot at this time be scientifically justified." American Academy of Orthopedic Surgeons, Position Statement, The AAOS Bulletin 3 (October, 1991). In addition, the American College of Radiology has stated: "The position of the American College of Radiology is that thermography has not been demonstrated to have value as a screening, diagnostic, or adjunctive imaging tool: 1990." *Efficacy of Thermography*, ACR Standards (Sept., 1990).

Other articles addressing the diagnostic and evaluative role of thermography also counsel against admission. *See* Edeiken, J. and Shaber, G., *Thermography: a reevaluation*, 15 Skeletal Radiology 545, 547 (1986); Mahoney, L., McCulloch, J., *Thermography as a Diagnostic Aid in Sciatica*, 7 Orthopaedic Transactions 104 (1983). Finally, a random survey of 405 members of the American Academy of Orthopaedic Surgeons demonstrates that the vast majority of these members do not use thermography or consider it helpful for evaluating neck and back pain.[5] Ash, C. and Foster, M., *Neuromuscular Thermography in Orthopedic Surgery: A Usage Poll*, 17 Orthopaedic Review 589 (June, 1988).[6] While many individual articles can be found in the literature that may support the use of thermography[7], we find that the

---

**5.** This survey consisted of a simple random sample of 405 active Fellows of the American Academy of Orthopaedic Surgeons. There were 316 responses with 293 Fellows indicating that they evaluate neck and back pain. Of those that responded, only eighteen use thermography, fourteen find thermography a valid test for neck and back pain, and seven find thermography helpful in their practice. The authors of this survey stated that these figures indicate that thermography is not generally accepted as a scientific test for the evaluation of neck and back pain by physicians who are active fellows of the American Academy of Orthopaedic Surgeons. *Usage poll, supra* at 590–92.

**6.** We note that the A.M.A.'s Council on Scientific Affairs submitted an Informational Report to the House of Delegates on "Thermography in Neurological and Musculoskeletal Conditions" dated in 1987. This report states that "[t]hermography may be useful in documenting peripheral nerve and soft tissue injuries, such as muscle and ligament sprain, inflammation, muscle spasm, and myositis. Thermography is helpful in the diagnosis of reflex sympathetic

dystrophy and can be used to follow the course of patients after spinal surgery." The report states that it reflects the views of the scientific literature as of February, 1987, but also states that "[t]his report is not intended to be construed as a standard of medical care." In a letter from the A.M.A. to Dr. Edwards, the A.M.A. stated that this report was received by the House of Delegates "for information only" and that the Council on Scientific Affairs has agreed to reconsider its report when new, scientifically valid information becomes available. From this exchange we gather that the A.M.A. has yet to take an official position with respect to thermography and therefore we do not view this report, or any previous similar report, as representing the views of the A.M.A., but rather as representing the views of the individual compilers.

**7.** The American Academy of Thermology has published a bibliography of thermology with over 5,000 listings from the world literature. *See* Abernathy M. Uematsu S. International bibliography of medical thermology.

specialties that have examined it support its exclusion from evidence at this point.

### 3. Opinions of other jurisdictions.

Finally, we are also persuaded that the weight of case law from other jurisdictions favors exclusion. While many of these courts exclude this evidence using a more deferential standard of review, we note that the majority of the courts cited have found that thermograms were not generally accepted enough to be admissible in their courts.[8] *See, for example, McAdoo v. United States* (1984), E.D.Mich., 607 F.Supp. 788, 795; *Miller v. State Farm Mut. Auto Ins. Co.* (1988), 168 Mich.App. 238, 424 N.W.2d 31; *Tonsberg v. VIP Coach Lines* (1987), 216 N.J.Super. 522, 524 A.2d 460, 463; *Ferlise v. Eilor* (1985), 202 N.J.Super. 330, 495 A.2d 129, 131; *Burkett v. Northern* (1986), 43 Wash.App. 143, 715 P.2d 1159, 1161.

In light of the foregoing authority, we hold that infrared thermography has not gained general acceptability in the medical communities that have evaluated this technique for their purposes and, therefore, is deemed inadmissible in Indiana under *Frye, supra.*

### B. Admissibility Before the Worker's Compensation Board.

■ Next, we must determine if, despite its inadmissibility under *Frye, supra,* infrared thermograms may be deemed admissible in proceedings before the Worker's Compensation Board. The rules of practice in proceedings before the Worker's Compensation Board, found in 631 IAC 1–1–3, state:

> Except as provided below the industrial board will not be bound by any technical rules of practice in conducting hearings, but will conduct such hearings and make such investigations in reference to the questions at issue in such manner as in

its judgment are best adapted to ascertain and determine expeditiously and accurately the substantial rights of the parties and to carry out justly the spirit of "The Indiana Workmen's Compensation Act (IC 22–3–2—IC 22–3–6)" ...

The rules of evidence, therefore, do not apply in their strict form to proceedings before the Board. *Noblesville Casting Div. of TRW v. Prince* (1982), Ind., 438 N.E.2d 722, 737; *Pike County Highway Dept. v. Fowler* (1979), 180 Ind.App. 438, 388 N.E.2d 630, 635. We are, however, not willing to throw off all bounds. Restrictions still apply.

■ There is a restriction built into the rule itself. 631 IAC 1–1–3 requires that the hearings are conducted in such a manner that the rights of the parties are determined *accurately.* Inherent in this requirement is a minimal level of reliability that must be present in the evidence presented to the Board.

For example, cases from this court and other Indiana courts recognize that while hearsay evidence is admissible in hearings before the Board, an award may not be based solely upon hearsay if it is properly objected to and preserved for review. There must be other evidence to support the award. *Brown Tire Co. v. Underwriters Adjusting Co.* (1991), Ind.App., 573 N.E.2d 901, 903–04; *Penn–Dixie Steel Corp. v. Savage* (1979), 180 Ind.App. 627, 390 N.E.2d 203, 207, *trans. denied.* This restriction on the free admissibility of hearsay evidence can only evince an unwillingness on the part of our courts to abandon all checks on the reliability and accuracy of particular testimony. To require evidence in addition to hearsay in support of an award demonstrates our desire for reliable evidence and trustworthy results.

■ Similarly, we believe that in hearings before the worker's compensation

---

*J.Am.Acad.Thermol.* 1987; 2:117–533. Seventeen hundred of these articles appear in the Cumulative Medical Index. However, less that 30 articles from peer-reviewed journals listed in the Index truly concern neuromuscular thermography and references to neuromuscular thermography are difficult to find in the core journals, textbooks, and yearbooks of the spe-

cialties that treat back pain. *Usage Poll, supra* at 589.

**8.** For additional information on the admissibility of thermograms, *see* Annotation, *Thermographic Tests: Admissibility of Test Results in Personal Injury Suits,* 56 A.L.R.4th 1105 (1987).

board, novel scientific evidence must have been found to be reliable before it will be admissible into evidence. Just as under *Frye*, litigants in administrative hearings should have the assurance that novel scientific techniques are, at a minimum, reliable.[9] We adopt the reasoning of *Cornett*. The administrative board should not, on a case by case basis, be called upon to resolve a conflict in the scientific community concerning the validity of a new scientific process. If the experts cannot agree about the reliability of a scientific technique, the courts should restrain its introduction because of potential harm and prejudice to the parties involved. *See Cornett, supra* at 503.

■ The medical opinion cited previously in this section demonstrates that thermograms have not yet been determined to be reliable by the medical specialties that have evaluated thermography for their purposes. *See supra* this issue. We therefore find that infrared thermograms are not at this time admissible in proceedings before the Board.

Issue II:

K–Mart next contends that there was insufficient evidence before the Board to sustain a finding that Morrison suffered from Reflex Sympathetic Dystrophy (RSD). We disagree.

K–Mart specifically challenges finding number 28 of the Board's decision which reads in pertinent part: "Further, because the physicians who rendered the diagnosis of RSD did not rely 100% upon the thermograms, any potential defect in the admission of such evidence is not determined to be fatal to the RSD diagnosis." Presumably K–Mart also challenges the Board's

conclusion number 3 which states: "That Plaintiff's accident aforementioned has resulted in reflex sympathetic dystrophy or sympathetically maintained pain in an advanced, insufficiently treated, and chronic stage." A challenge to conclusion number 3 is not specifically included in K–Mart's argument. An examination of its brief, however, leads us to conclude that this issue is sufficiently presented for review.

■ It is the duty of the Worker's Compensation Board, as trier of fact in disability cases, to make findings which reveal its analysis of the evidence and are specific enough to permit intelligent review of the Board's decision. *Rockwell International v. Byrd* (1986), Ind.App., 498 N.E.2d 1033, 1037. In reviewing the Board's decision, we will not reweigh the evidence or assess the credibility of the witnesses. *Id.* We employ a two-tier standard in this review. We will review the evidence in the record to see if there is any competent evidence of probative value to support the Board's findings. We then examine the findings of fact to see if they are sufficient to support the decision. *Id.* We will consider only the evidence most favorable to the award, including any and all reasonable inferences deducible from the proven facts. *Id.*

■ K–Mart here challenges the Board's findings of fact regarding Morrison's RSD. K–Mart specifically contends that the thermogram performed by Dr. Edwards is inadmissible evidence and because this thermogram was the only objective evidence in the record that Morrison suffered from RSD, the Board's finding on this issue must fail.[10] We have determined that infrared thermograms, like the one at issue here, are inadmissible evidence in

---

9. We note that determining the reliability of novel scientific evidence is a smaller hurdle to overcome than determining general acceptability under *Frye*. While *Frye* inherently determines reliability, it also considers the usefulness and, more broadly, the general acceptance of a technique.

10. K–Mart also argues that Morrison, in order to have been properly diagnosed with RSD must have evidenced at least six of the standard

symptoms of the disease. Morrison apparently evidenced only one or possibly as many as three of these. K–Mart argues that this should bar any finding of RSD as a matter of law. We disagree.

The testimony in the record indicates that, while it may be advisable to find at least six of these symptoms before making a positive identification of RSD, not all RSD patients will have six symptoms and six symptoms are not needed for a positive diagnosis. There is no error here.

Indiana. We do not, however, agree that this is the only evidence in the record upon which the Board could have relied in finding as it did.

In this case, three independent doctors diagnosed Morrison with RSD: Dr. Johnson, Dr. Edwards, and Dr. Hicks. Dr. Edwards, Morrison's primary treating physician, testified that there are at least two tests that can be performed that are helpful in the diagnosis of RSD: the stellate ganglion block [11] and the thermogram. Dr. Hicks also testified that stellate blocks are used for diagnosing patients with sympathetic dystrophy. Dr. Edwards and Dr. Hicks both performed stellate blocks on Morrison and Dr. Edwards testified that Morrison responded favorably to the test by an objectively measurable rise in temperature in her upper left extremity and relief from pain, giving him enough evidence to confirm his diagnosis. Dr. Hicks also testified that the stellate block performed by him indicated that Morrison suffered from RSD. In addition to the stellate block, Dr. Edwards testified that Morrison's physical symptoms and complaints suggested the presence of RSD and Dr. Hicks testified that he performed a physical exam on Morrison which confirmed his diagnosis.

From this sampling of evidence we find that there were sufficient facts from which the Board could find that Morrison suffered from RSD without relying on the thermogram. Indeed, the thermogram in this case was not performed by Dr. Edwards until after both Dr. Edwards and Dr. Hicks had diagnosed Morrison's condition using other means. We find no error here.

Issue III:

Next, K–Mart challenges the Board's finding of permanent total disability. In conclusions numbers 7 and 8 the Board found that "Plaintiff is permanently and totally disabled, as a result of her accident with Defendant October 9, 1986, from and after March 9, 1988, the last day she worked for Defendant, to the date of hearing, April 9, 1991, which period of time constitutes 163–2/7ths weeks. That Plaintiff is now and will continue to be permanently totally disabled as a result of the accident at K–Mart on October 9, 1986." The Board then granted Morrison an award based on her permanent total disability in the amount of $75.00 per week for 500 weeks, later amended to $97.33 per week for 500 weeks.

Our review of the Board's conclusion regarding permanent total disability must be decided within the scope of appellate jurisdiction. It is not this court's prerogative to weigh the evidence or judge the credibility of witnesses. *Talas v. Correct Piping Co., Inc.* (1982), Ind., 435 N.E.2d 22, 26. We may consider only that evidence which tends to support the Board's determination, together with any uncontradicted adverse evidence. *Id.* Only when the evidence leads inalterably to a conclusion contrary to that reached by the Board will its decision be disturbed. *Id.* Similarly, this court has stated that it is the province of the Board to hear and weigh the evidence, determine the evidentiary facts and from such facts draw reasonable inferences to arrive at the ultimate fact. *Kancs v. Walker* (1990), Ind.App., 557 N.E.2d 670, 672, *trans. denied.* The finding of the ultimate fact becomes a question of law for the determination of the reviewing court only where there can be but one reasonable inference drawn from the evidentiary facts established by the uncontradicted evidence. *Id.*

The Board's finding of permanent total disability is an ultimate fact that must be supported by evidence in the record. *Perez v. United States Steel Corp.*

---

**11.** A stellate ganglion block is a block of the sympathetic nerve supply to, in this case, the blood vessels in Morrison's upper left arm. In patients with RSD, damage to these nerves can cause blood vessels to constrict instead of expand in response to injury, causing pain and other complications. (R. 791). A local anesthetic can be put on these nerves that will block the messages sent by the sympathetic nerves to the blood vessels thereby preventing the blood vessels from constricting unnaturally. A rise in temperature and a release from pain will usually accompany a successful block.

(1981), Ind., 426 N.E.2d 29, 33.[12] Permanent total disability, by its very name, consists of three separate elements, all of which must be supported in the record and each of which should be separately enumerated in the Board's findings of fact. These three are: (1) permanence, or quiescence, (2) total, as opposed to partial, scope of the disability, and (3) disability, referring to the injured employee's inability to work. Because the record in this case is devoid of any evidence that Morrison's disability had reached a permanent or quiescent state, we reverse the Board's decision on this point.

In general, permanence, or quiescence, is necessary to a finding of permanent total disability. For example, in *White v. Woolery Stone Co., Inc.* (1979), 181 Ind.App. 532, 396 N.E.2d 137, 139, the court explained the difference between temporary and permanent total or partial disability. The court stated that permanent total or partial disability could be determined "when the work-related injury reaches a permanent and quiescent state, the treatment period ends, and the permanent injury can be assessed for compensation purposes." *Id., see also Dennison v. Martin, Inc.* (1979), 182 Ind.App. 491, 395 N.E.2d 826, 828 (When the injury reaches a permanent and quiescent state, an assessment is made of the extent of permanent injury. The permanent loss results in benefits for total permanent disability and permanent partial impairment, as proven by the evidence). The court in *Woolery Stone* went on to quote Dean Small, *Workmen's Compensation Law of Indiana,* § 9.4, p. 244: "A total disability to be permanent must be one which so destroys or shatters a workman's wage earning capacities as to leave him *unable to resume* reasonable types of employment *for the remainder of his life.*" *Id.* (emphasis added). In addition, our supreme court has stated that in order to

establish a permanent total disability, the injured workman is required to prove that he or she cannot carry on reasonable types of employment. *Perez v. United States Steel Corp.* (1981), Ind., 428 N.E.2d 212, 215–16. The court went on to explain that the principle of § 10 of the Worker's Compensation Act is to provide a fixed amount of recovery for a *permanent* loss. *Id.* at 216. In this context a provision for permanent disability, that is, the inability to work *for the remainder of one's life,* naturally carries the connotation of the inability to reasonably earn a livelihood. *Id.*

Viewing the evidence most favorable to Morrison, we find that Morrison's disability was not permanent or quiescent. For example, Dr. Edwards, Morrison's primary physician for the treatment of her RSD and her main witness at the hearing, stated that certain proposed treatments could reduce or even negate Morrison's RSD. He explained that the RSD could revert to the point where similarly afflicted individuals could "become working individuals and this gets them off the social security rolls and so forth." In addition, Dr. Frank, a psychologist and vocational counselor, stated in his written evaluation of Morrison that "medical opinion is that with proper treatment she would have little or no disability ..." Dr. Hicks, another of Morrison's expert witnesses, also testified that in his estimation Morrison could be improved and possibly reasonably restored to ordinary life with four weeks of rehabilitation with medical therapy.

■ While several of Morrison's experts testified directly that Morrison was permanently totally disabled within the meaning of the Act, these opinions were not based on evidence found in the record and *were qualified* by conditional statements. For example, Dr. Hicks testified

---

**12.** Our supreme court in *Perez, supra,* 426 N.E.2d at 33 explained that "[t]he 'finding of ultimate fact' is the ultimate factual conclusion regarding the particular claim before the Board; here, for example, that ultimate question is whether Perez is permanently totally disabled. The finding of *ultimate* fact may be couched in the legal terms and definitions which govern the particular case. In contrast, the specific findings of basic fact must reveal the Board's determination of the various relevant sub-issues and factual disputes which, in their sum, are dispositive of the particular claim or ultimate factual question before the Board. The findings must be specific enough to provide the reader with an understanding of the Board's reasons, based on the evidence, for its finding of *ultimate* fact."

that Morrison would be permanently totally disabled *if* no medical treatment were undertaken. The full exchange reads as follows:

Q Doctor, do you have an opinion within the framework of medical certainty whether Jo Ann Morrison is permanently totally disabled as a result of her work-related accident of October 1986, and by that I mean permanently unable to resume reasonable types of employment from a medical standpoint?

A Without any medical treatment being undertaken?

Q Yes.

A Yes.

Q Is she permanently totally disabled without medical treatment?

A Without medical treatment, yes.

Q Could she still benefit from proper medical treatment?

A Yes.

(R. 817–18). Dr. Frank also conditioned his testimony when questioned further by the single member:

THE COURT: Dr. Frank, so I understand it, you've given an opinion that this lady's permanently and totally disabled from any gainful, substantial employment for the remainder of her life?

DR. FRANK: Yes, I have.

THE COURT: And you've premised that opinion primarily on the fact that she has intractable pain, is that your testimony?

DR. FRANK: Yes, and she suffers from RSD ... the opinion of Dr. Hicks, as I understood it, was that if she was not treated, then she would be totally and permanently disabled because of the pain....

THE COURT: Well, would your opinion change if I were to tell you that there is a specialist, who has stated that he has further treatment, which would alleviate a substantial, almost total relief from pain, would your opinion then change as to any permanency of an impairment?

DR. FRANK: Sure, if she gets better at some point and time, she would not have any impairment at all.

(R. 708–10). Therefore, even the most direct testimony in the record concerning permanent total disability, in addition to being unsupported by facts in the record, further serves to convince us that Morrison's disability was not permanent or quiescent.[13] Without such evidence in the record, the Board's finding must fail. We therefore remand this issue to the Board for a redetermination, using the facts as presented in the record, of Morrison's disability status.[14]

Issue IV:

K–Mart next contends that Morrison unjustifiably refused a job offered to her by K–Mart that was within restrictions set out in a work release authorized by Dr. Edwards. K–Mart asserts that it is entitled to deduct from the Board's award the amount of any compensation that would have been paid to Morrison had she accepted the employment.

*Perez v. United States Steel Corp.* (1977), 172 Ind.App. 242, 359 N.E.2d 925, 927, and permanent total disability refers to an inability to work for the remainder of one's life. *See supra* this issue. It is therefore difficult to imagine how Morrison could be permanently totally disabled on March 9, 1988, when less that a year later she was released to work by her primary treating physician.

---

**13.** We note that, in addition to the lack of evidence concerning the permanent nature of Morrison's disability, there is convincing evidence in the Board's findings itself to support an opposite conclusion. For example, the Board found in conclusion number 7 that "Plaintiff is permanently and totally disabled ... from and after March 9, 1988, the last day she worked for Defendant, to the date of hearing, April 9, 1991 ..." (R. 285–86, 300–01). The Board also found in finding number 6 that "Bernard Edwards, M.D., one of Plaintiff's treating physicians, released Plaintiff to return to work on January 31, 1989 [with restrictions]." (R. 278, 293). The definition of disability within the worker's compensation act refers to the inability to work,

**14.** By this action we do not mean to foreclose any future petitions for modification or any other remedies that may be available to the parties under IC 22–3–3–27.

■ IC § 22–3–3–11 governs the question of refusing tendered employment and reads as follows:

(a) If an injured employee, only partially disabled, refuses employment suitable to his capacity procured for him, he shall not be entitled to any compensation at any time during the continuance of such refusal unless in the opinion of the worker's compensation board such refusal was justifiable.

(b) Before compensation can be denied under this section the employee must be served with a notice setting forth the consequences of the refusal of employment under this section. The notice must be in a form prescribed by the worker's compensation board.

Under IC 22–3–3–11, an employer is permitted to reduce its workmen's compensation obligation by procuring for the injured employee employment by which he can earn some wages without injury to himself. *Jones & Laughlin Steel Corp. v. Kilburne* (1985), Ind.App., 477 N.E.2d 345, 350, *trans. denied.* If the injured employee refuses the procured employment the employer's worker's compensation obligation is suspended unless the Board determines that the refusal was justified. *Id.* Until suitable employment has actually been procured by the employer and refused by the employee, IC 22–3–3–11 does not apply. *Id.* Furthermore, IC 22–3–3–11 only applies where the employee is partially disabled. *Id.*

On January 31, 1989, Dr. Edwards wrote a letter releasing Morrison to return to work. The letter outlined several restrictions and read as follows:

TO WHOM IT MAY CONCERN:

After undergoing a long illness following injury, it is felt that this patient [Morrison] may be returned to restricted work as outlined below.

She may lift no more that ten (10) pounds in weight and may not lift anything above the shoulder level. She may not climb any ladders until further notice.

(R. 516). Morrison took this letter to K–Mart and K–Mart responded by offering Morrison a job within these restrictions at the jewelry counter. K–Mart also included Morrison's work hours for the next week. Morrison did not, however, return to work, informing someone at K–Mart that she was sensitive to cold and that the jewelry counter was too close to the doors.

■ At this point, IC 22–3–3–11 becomes applicable. Morrison was partially disabled, as evidenced by the letter from Dr. Edwards releasing her to work, K–Mart tendered suitable employment within the restrictions laid out in the work release, and Morrison refused the tendered employment. The question then becomes whether the Board determined if Morrison's reason for refusing the employment was justified and, if not, did Morrison receive the kind of notice outlined in subsection (b).

The Board made findings of fact related to this question. Finding number 6 states: "Bernard Edwards, M.D., one of Plaintiff's treating physicians, released Plaintiff to return to work on January 31, 1989, with a weight restriction prohibiting her from lifting more that 10–pounds or from lifting anything above the shoulder level. She was also restricted from climbing." Finding number 7 continues: "Plaintiff acknowledged the February 13, 1989 job offer of the Defendant to work at the jewelry counter; however, she testified that she spoke with both her supervisor, Chris Owens, and Mr. Fields, who worked for Defendant and told them while she had considered the position, the jewelry counter was near the doors, and she felt she was so sensitive to temperatures, that she would not be able to perform the job."

The Worker's Compensation Board's responsibility as trier of fact in disability cases is to make findings of fact which reveal its analysis of the evidence and are specific enough to permit intelligent review of the Board's decision. *Perez, supra,* 428 N.E.2d at 312; *Rockwell, supra,* at 1037. The evidence in the record must be sufficient to support the Board's findings and the findings must support the award. *Rockwell, supra,* at 1037.

■ Our insistence on compliance with the requirement to make specific findings is not predicated on esoteric legal technical-

ities or the rote imposition of statutory provisions. Rather, as the General Assembly undoubtedly recognized in establishing the fact-finding requirement, specific findings of fact are essential to an effective system of administrative law. *Perez, supra,* 426 N.E.2d at 31. The practical reasons for requiring administrative findings are so powerful that the requirement has been imposed with remarkable uniformity by virtually all federal and state courts, irrespective of a statutory requirement. The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction. *Id.;* Davis, 2 *Administrative Law Treatise* § 16.05 p. 444 (1985).

In this case the Board's findings are merely a recitation of the evidence about who said what and reveal nothing, specific or otherwise, about the Board's conclusions regarding that evidence. In *Perez, supra,* 426 N.E.2d at 33, our supreme court stated that "statements to the effect that 'Mr. Jones testified so and so ...,' or that 'the Industrial Board finds Dr. Smith testified so and so ...,' are *not* findings of basic fact in the spirit of the requirement. Statements of that nature lend perspective to our task, but in no way indicate what the Board found after examining all the evidence." In other words, they fail to tell us *what* or *whom* the Board decided to believe. Therefore, without a finding of fact based on evidence in the record—specifically whether Morrison's claim to being chilled near open doors is a medically justifiable reason for refusing the job offer—we are unable to discern if the Board found her refusal justifiable. We therefore remand to the Board with the directive that it enter adequately specific findings of fact on the question of whether Morrison's re-

fusal was justifiable and, if not, whether she received notice of its consequences pursuant to IC 22–3–3–11(b). If the Board finds that Morrison's refusal was not justifiable and that she received adequate notice, the Board should make additional findings, based on the evidence found in the record, concerning the length of her refusal. The Board should then reduce the award by the length of time encompassed by the refusal.[15]

Issue V:

K–Mart also contends that the Board erred in awarding Morrison over $9,000.00 in medical expenses. Specifically K–Mart asserts that it has already paid, either directly or through its health insurance carrier, a substantial number of the claimed medical expenses and that the other expenses incurred were not authorized as required by IC 22–3–3–4.

Ind.Code § 22–3–3–4 governs the medical treatment of injured employees pending adjudication of impairment and reads as follows:

(a) After an injury and prior to an adjudication of permanent impairment, the employer shall furnish or cause to be furnished, free of charge to the employee, an attending physician for the treatment of his injuries, and in addition thereto such surgical, hospital and nursing services and supplies as the attending physician or the worker's compensation board may deem necessary....

Under IC 22–3–3–4, after a work-related injury and before an adjudication of permanent impairment, an employer is required to furnish or cause to be furnished an attending physician and any other medical services that the attending physician or the Board may consider necessary. *Richmond State Hospital v. Waldren* (1983), Ind. App., 446 N.E.2d 1333, 1336.

---

**15.** The Board should note that we have found as a matter of law that there is insufficient evidence in the record to sustain a finding of permanent total disability. Morrison therefore cannot be considered permanently totally disabled for the purposes of this statute and IC 22–3–3–11 will apply to her situation if all other

requirements are met. *See e.g. Jones v. Laughlin, supra* at 350 (The court stated that IC 22–3–3–11 applies only where the injured employee is partially disabled. The employee was found to be permanently totally disabled and therefore IC 22–3–3–11 was found to be inapplicable).

It is undisputed that K–Mart tendered substantial medical treatment to Morrison and paid all medical bills submitted to it while Morrison was still working. After Morrison went on her leave of absence, many of the bills were submitted to and paid by K–Mart's health insurance carrier, Blue Cross Blue Shield. The Board awarded Morrison "all statutory medicals, including any unpaid portion of plaintiff's incurred medical expenses set forth in Plaintiff's Exhibit # 4 ..." (R. 286, 301). Exhibit # 4 lists $9,462.86 worth of hospital, pharmacy, and doctor's bills incurred by Morrison from October, 1986 through April, 1991. Many of these bills are marked as paid by Blue Cross and K–Mart alleges that it paid some of these bills directly from its own accounts. The Board did not, however, state the exact amount of the contested award in a dollar amount and upon review of the evidence we are unable to determine whether the Board subtracted "any unpaid portion" of these bills or whether the full $9,462.86 was figured into the total. We therefore remand this issue to the Board for a specific finding of what portion of these bills remain unpaid; that is, which medical providers have yet to be paid for their services and how much is still owing to each. The medical providers should not be allowed to recover for services for which they have already been paid.[16]

Next, we must determine if any portion of the unpaid bills were incurred by Morrison without K–Mart's knowledge or authorization. Under IC 22–3–3–4 an employee is generally not free to elect, at the employer's expense, additional treatment or other physicians than those tendered by the employer. *Id.; Perez, supra,* 359 N.E.2d at 926. Nevertheless, the statute allows the employee to select medical treatment under three circumstances: (1) in an emergency; (2) if the employer fails to provide needed medical care; or (3) for other good reason. *Richmond, supra* at 1336.

We are concerned here with whether K–Mart failed to provide Morrison with needed medical care. The majority rule is set forth in 2 Larson, *Workmen's Compensation Law* § 61.12(c) (1981):

[I]t is generally held that the employee should ... not incur medical expense without first giving the employer a reasonable opportunity to furnish such services, and if he does so, the employee will be liable for that expense himself. The mere fact that claimant has more faith in his family doctor, or lacks confidence in the employer's doctor, is not enough to change the rule.

When the employer has no knowledge of the need for medical services and no opportunity to tender the medical services, he cannot be held liable for them. *Richmond, supra* at 1336. There can be no failure to provide within the meaning of the statute without knowledge of the need. *Id.*

After examining the record before us, we find that K–Mart had knowledge of Morrison's continuing need for medical services up to and including her visits to Dr. Johnson. The evidence reveals that Morrison talked with her supervisor and obtained his approval for each physician that she saw while she was still working at K–Mart. Morrison then went to see Dr. Johnson on the recommendation of a friend without first informing K–Mart. However, she immediately advised her supervisor of the visit the next day and her supervisor informed her that she "could do what had to be done." Morrison also turned in to K–Mart medical leave slips given to her by Dr. Johnson. Under the circumstances of this case and because of the previous pattern of approval established between the parties, we find that K–Mart had knowledge of Morrison's need up to this point.

---

**16.** We note that this issue is fundamentally different from the issue of collateral payments addressed in Issue VI, *infra.* Here we limit ourselves to the language used in the Board's award and seek to enforce its meaning. The Board awarded "unpaid" medical expenses and ordered that they be paid to the medical providers by Morrison's attorney. If these providers have already received payment, no matter who wrote the check for their services, the bill is no longer "unpaid" for our purposes.

After Morrison took her leave of absence from K-Mart in March of 1988, however, Morrison did not continue her habit of informing K-Mart of her need and gaining approval for medical treatment from her supervisor. She sought the services of Dr. Edwards in August of 1988 after a friend had recommended him to her and after she had attended a lecture that he had given. Dr. Johnson then wrote a letter to Dr. Edwards at Morrison's request referring her to Dr. Edwards.

Dr. Edwards also referred Morrison to Dr. Hicks in February of 1990. The record reveals that the only communication to K-Mart concerning all this medical activity was a letter from Dr. Edwards releasing Morrison to work in January of 1989. In addition, Dr. Hicks lamented that he was unable to treat Morrison as he would have liked because his treatments were not authorized.

We hold that under these circumstances K-Mart had no knowledge of Morrison's continuing need and therefore no opportunity to tender appropriate medical services. While K-Mart did have indirect knowledge of Dr. Edwards, through the letter releasing Morrison to work, such indirect knowledge is inadequate to put K-Mart on notice of its continuing duty to supply the needed services in this case. In addition, Morrison makes much of the referrals that each doctor sent on to the next, stating as she did in her brief before the full Board, "all roads lead to Rome." We do not agree that mere referrals will validate unknown and unauthorized doctors or treatments simply because they descend in a direct line from an authorized doctor or treatment. Each new doctor or treatment should, at the very minimum, be communicated to the employer in such a way that that employer is put on notice that medical care is needed and the employer is given an opportunity to provide.[17] This was not done here and therefore K-Mart cannot be held liable for these treatments. The Board is therefore instructed to exclude from its determination of unpaid medical bills the services of Drs. Edwards and Hicks as well as any related expenses incurred after Morrison began her medical leave in March of 1988.[18]

Issue VI:

K-Mart next contends that the Board erred by failing to credit K-Mart with disability payments previously paid to Morrison. We disagree.

During a 26 week period beginning in March of 1988, Morrison drew benefits under K-Mart's disability program. (R. 521, 530). These benefits were paid by Aetna, K-Mart's disability insurance carrier, and totalled $2,210.00. The Board also awarded Morrison permanent total disability payments of $75.00 per week (which were later changed to $97.33 per week) for this same period of time. K-Mart argues that Morrison is not entitled to two payments for the same disability.

Indiana statutory law contains specific language which controls the credit claimed by K-Mart. IC 22-3-3-23 states:

(a) Any payments *made by the employer* to the injured employee during the period of his disability, or to his dependents, which by the terms of IC 22-3-2 through IC 22-3-6 were not due and payable when made, may, subject to the approval of the worker's compensation board, be deducted from the amount to be paid as compensation. (emphasis added).

The court in *Rockwell, supra,* at 1040, interpreted this passage and stated that "[a]s this statutory section clearly indicates, it is payments *made by the employer* which are subject to a credit, not payments made by an insurance carrier under terms of a specific policy." (emphasis in original). The court then held that because the payments

---

17. We understand that by this we are putting a burden upon the recipients of worker's compensation benefits to communicate with their employers. This is a minimal burden, however, and one already implicit in IC 22-3-3-4 and *Richmond, supra.*

18. This holding is limited to the medical expenses incurred by Morrison prior to the hearing held on April 9, 1991.

were made by the employer's sickness and accident insurance carrier and not by the employer itself, no credit could be allowed and therefore the Board lacked the jurisdiction under this statute to consider the matter. *Id.* at 1040–41.

The court in *Freel v. Foster Forbes Glass Co.* (1983), Ind.App., 449 N.E.2d 1148, 1150–51, also addressed this issue. There, the court approved a Board decision that gave an employer credit for wage continuation payments made to an employee. The employer was self-insured for the purposes of workmen's compensation benefits as well as sickness and accident benefits, with such payments being made using the same corporate account payroll funds. *Id.* at 1149–50. The court, in referring to this situation, stated that "[i]n the case at bar it is the employer who has made payments from its payroll account, and any Workmen's Compensation payments due to the Freels would come from the same source since Foster Forbes is self-insured." *Id.* at 1150. Because there was no separate insurance carrier involved, the Board had jurisdiction and granted credit to the employer. The reviewing court affirmed the Board's grant based on the Act's strong policy against double recovery. *Id.* at 1151.

██ In this case, K–Mart did not self-insure its employee disability program and it was Aetna, K–Mart's insurance carrier, that paid the $2,210.00 in disability payments to Morrison. The payments were therefore not paid by the employer as the statute requires. Under *Rockwell, supra,* it is clear that the Board lacked the necessary jurisdiction to address this question even if it had awarded credit. While Aetna may wish to seek reimbursement from Morrison depending on the specifics of its policy with K–Mart, the Board was correct in not giving credit to K–Mart for disability payments made by Aetna.

Issue VII:

Lastly, K–Mart alleges that the single member erred in re-opening the award and adjusting the award of 500 weeks of permanent total disability from $75.00 per week to $97.33 per week. In light of our discussion in Issue III, holding that the finding of permanent total disability was error, we decline to address this question. Because the Board is instructed on remand to revisit the question of Morrison's disability status in light of this holding, they must also revisit the question of compensation for Morrison's newly determined disability status. This moots any discussion on the propriety of reopening the award.

CONCLUSION:

For the foregoing reasons we affirm the Board's decision with regard to Issues II and VI, reverse on Issues I and III, and remand on Issues IV and V for further proceedings consistent with this opinion.

HOFFMAN and RUCKER, JJ., concur.