Barry **DAUGHERTY**, Appellant–Plaintiff,

v.

**INDUSTRIAL CONTRACTING & ERECTING**, Appellee–Defendant.

No. 93A02–0110–EX–671.

Court of Appeals of Indiana.

April 16, 2002.

Michael Rader, Terre Haute, IN, Attorney for Appellant.

Kathryn A. Moll, Nation Schoening Moll, Fortville, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Barry Daugherty filed an application for adjustment of claim with the Workers Compensation Board of Indiana (the "Board") against his employer, Industrial Contracting and Erecting ("ICE"). A single hearing judge denied his claim, and Daugherty petitioned the full Board, which affirmed the single hearing judge's decision. Daugherty now appeals and presents the following restated issues for our review:

1. Whether the Board's denial of payment for Daugherty's knee replacement surgery and prospective treatment of that knee were supported by sufficient evidence.

2. Whether the Board's decision to credit ICE for worker's compensation benefits that it had already paid to Daugherty was supported by sufficient evidence.

3. Whether the Board stated its findings and conclusions with enough specificity to permit this court to adequately review the Board's decision.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On May 8, 1997, Barry Daugherty was working as a laborer for ICE when he fell

off the "fork truck tarping machine" on which he was standing and tumbled about fifteen feet to the ground. As he fell, Daugherty hit his right knee on a protruding steel rail, causing severe injury. Daugherty could not return to work, so ICE paid Daugherty worker's compensation benefits, for what doctors determined was a temporary total disability, at a rate of $402.28 per week for approximately 30 weeks between August 1997 and March 1998.

On March 11, 1998, after overseeing Daugherty's care for several months, Dr. Robert C. Gregori issued a report stating that Daugherty suffered from some permanent disability and found that his knee injury had reached a quiescent state. He therefore assigned Daugherty a permanent partial impairment rating of ten percent (10%) of the right lower extremity. Based on this evaluation, ICE reduced Daugherty's disability payments to $225 per week. Because he was still experiencing significant pain, Daugherty requested that the Board appoint a physician to conduct an independent medical evaluation of his knee. Pursuant to this request, Dr. Frank Throop examined Daugherty and found that he suffered lingering pain in his knee, but that his injury had achieved its "maximum medical improvement."

Unhappy with these results, Daugherty privately consulted Dr. Peter Brooks, an orthopedic surgeon at Cleveland Clinic. Dr. Brooks concluded that Daugherty's persistent knee pain was the result of "degenerative change," and recommended that he undergo a "right total knee arthroplasty." Daugherty did not report Dr. Brooks' recommendations to the Board nor did he get approval for the surgery from ICE. Nonetheless, Daugherty underwent the knee replacement surgery in October 1998, at Cleveland Clinic. Four months after the surgery, Daugherty returned to work and was able to eventually resume his normal job duties.

Shortly after his surgery, Daugherty filed an "application for adjustment of claim" with the Board. Following a hearing, a single judge awarded Daugherty $3,329.45 for his temporary total disability during the four months he spent recuperating from his knee replacement surgery. Against this amount, the Board credited ICE the $225 per week that it had paid in workers compensation benefits to Daugherty during that period. Daugherty was also awarded $3,375 for the permanent partial impairment of his right knee resulting from his injuries. However, because he underwent the knee replacement surgery without prior approval from ICE or the Board, the judge declined to award Daugherty the costs of his knee replacement surgery or any money for prospective care and treatment of his knee. Daugherty petitioned the full Board, which affirmed the single judge's decision. This appeal ensued.

## DISCUSSION AND DECISION

### Knee Replacement Surgery

Daugherty first contends that the Board's denial of payment for his knee replacement surgery and prospective treatment of that knee is not supported by sufficient evidence. We do not agree.

 In reviewing a decision of the Board, we employ a two-tiered standard of review. *Outlaw v. Erbrich Prod. Co., Inc.,* 742 N.E.2d 526, 529 (Ind.Ct.App.2001). We will review the evidence in the record to see if there is any competent evidence of probative value to support the Board's findings and then examine the findings to see if they are sufficient to support the decision. *Id.* We will not reweigh the evidence or assess the credibility of witnesses. *Id.* Rather, we will consider only

the evidence most favorable to the award, including any and all reasonable inferences deductible from the proven facts. *Id.*

■ Pursuant to Indiana Code Section 22–3–3–4(d), an employee is generally not free to elect, at the employer's expense, additional treatment or other physicians than those tendered by the employer. *K–Mart v. Morrison,* 609 N.E.2d 17, 31 (Ind. Ct.App.1993), *trans. denied.* Nevertheless, the statute allows the employee to select independent medical treatment under three circumstances: (1) in an emergency;[1] (2) if the employer fails to provide needed medical care; or (3) for other good reason. *Id.*

Indiana Code Section 22–3–4–5(a) provides, in general, that should the employer and employee disagree about the amount of compensation owed, either party may submit an application to the board to resolve the dispute. More specifically, Indiana Code Section 22–3–3–4(b) states that:

> During the period of temporary total disability resulting from the injury, the employer shall furnish the physician services, and supplies, and the [Board] may, *on proper application of either party,* require that treatment by the physician and services and supplies be furnished by or on behalf of the employer as the [Board] may deem reasonably necessary.

(Emphasis added).

■ Here, after several doctors had treated Daugherty, Dr. Gregori found that Daugherty's knee had reached a quiescent state. Dr. Throop, whom the Board appointed, agreed that Daugherty's injury had reached a state of maximum recovery. Daugherty disagreed with the assessment of his injury and sought the advice of Dr. Brooks, who recommended that he undergo a total knee replacement. While Daugherty relayed Dr. Brook's recommendation by phone to a representative from ICE's insurance carrier, he neither submitted that recommendation in writing to the insurance company nor to the Board. He nevertheless underwent the surgery without approval from ICE or a determination by the Board as to who should pay for the surgery. Indeed, the Board specifically found that the surgery "was clearly and definitively unauthorized by [ICE] and its workers compensation carrier at the time Daugherty chose to go forward with it." And while the surgery resulted in Daugherty being able to resume his normal work duties and the Board, albeit in hindsight, found that the surgery was "reasonable and appropriate," six other physicians who had treated Daugherty did not suggest that he undergo a knee replacement.

■ We agree with Daugherty's assertion that "[t]he mere refusal of an employer to pay for needed treatment does not as a matter of law resolve whether or not services should be provided and paid for by the employer." But that is not the case here. ICE and its carrier did not simply refuse to pay for needed treatment. Rather, Daugherty underwent a surgery, which had been recommended by only one of several physicians, and he did so without first seeking approval. This was not an emergency, and if ICE and its carrier had declined coverage, Daugherty would have had recourse to the Board. Daugherty sought approval only after-the-fact. Un-

---

1. While Daugherty also suggests that his knee replacement amounted to an "emergency," therefore relieving him of the duty to notify ICE's insurance carrier or the Board, he offers no evidence to support that assertion. Further, he does not adequately explain why he could not have sought the Board's approval after ICE's insurance carrier initially refused to pay for the knee replacement. *See* Ind.Code § 22–3–3–4(d).

der these circumstances, we conclude there was sufficient competent evidence to support the Board's denial of coverage for the surgery.[2]

Daugherty also asserts that there was insufficient evidence to support the Board's denial of prospective medical care and treatment of his surgically repaired knee. Given our conclusion that the Board did not err when it declined to cover the cost of the surgery itself because Daugherty proceeded without authorization from ICE's insurance carrier or the Board, we cannot logically conclude that the Board should have nonetheless ordered ICE to pay for future treatment stemming from that surgery.

Regardless, the only evidence that Daugherty offers regarding "future" medical care and treatment stems from Dr. Brook's "Preoperative Assessment" of Daugherty. In that report, Dr. Brooks comments that: "I am prepared to offer [Daugherty] a right total knee arthroplasty ... and [he] understand[s] that he will do as much as he can to take care of it and will *ultimately end-up with revision surgery.*" While Daugherty argues that this statement means his knee will require future medical care, ICE maintains that the "revision surgery" refers not to future medical treatment but to the steps necessary to successfully complete the knee replacement. The Board adopted ICE's interpretation. While it might have conceivably adopted Daugherty's perspective, we cannot say that the

evidence leads unalterably to a conclusion contrary to that reached by the Board. *See K–Mart Corp.,* 609 N.E.2d at 28.

### Credit to ICE

Daugherty next contends that the Board's decision to credit ICE about $4,000 against worker's compensation benefits that it had already paid to Daugherty was not supported by sufficient evidence. Specifically, Daugherty argues that the $225 per week that ICE paid to him from October 1998 to February 1999 were payments received from a disability insurance policy with ICE and were not worker's compensation benefits. Again, we must disagree.

 Indiana Code Section 22–3–3–23(a) provides that "[a]ny payments made by the employer to the injured employee during the period of his disability, or to his dependents, which ... were not due and payable when made, may, subject to the approval of the [Board], be deducted from the amount to be paid as compensation." This language clearly indicates that the Board may credit against its award to an employee any worker's compensation payments made *by the employer* to the injured employee during his period of disability. *See Rockwell Int'l v. Byrd,* 498 N.E.2d 1033, 1040 (Ind.Ct.App.1986).

 Here, Daugherty admitted that he had received $225 per week from ICE during the period in question. But he testified that those benefits were paid pur-

---

2. We acknowledge the rather harsh outcome for Daugherty in this case. But if we forced the Board to pay for Daugherty's knee replacement, despite numerous medical opinions that such was not warranted, we would be opening the "flood gates" for all unhappy worker's compensation claimants to seek their own medical advice and treatment and then expect to be compensated for that elective treatment by the Board or this court. In other contexts, claimants or insured persons must first get approval from their insurance company before proceeding with medical treatment—HMO's and PPO's are prime examples. We see no compelling reason to elevate worker's compensation claimants to a status above others thrust into analogous circumstances. That seems an especially sound course where, as here, Daugherty failed to satisfy the statutory requirements to seek non-approved independent medical treatment.

suant to an employee disability insurance policy with ICE, contributions for which were deducted from his regular paycheck. However, Daugherty acknowledged that the checks he received were drawn and issued by ICE and not by ICE's disability insurance carrier. In addition, Michelle Murray, a workman's compensation claim adjuster for ICE's insurance carrier, testified that the payments Daugherty received were worker's compensation benefits paid directly by ICE and were not disability insurance payments. Murray stated that Daugherty was ineligible to receive disability benefits because he was injured while on the job. ICE's disability policy "would only pay if he was hurt outside of work." This evidence was sufficient to support the Board's decision to credit ICE the worker's compensation payments that it made to Daugherty.

### Board's Findings and Conclusions

■ Lastly, Daugherty argues that the Board's findings and conclusions are not specific and detailed enough to allow this court to intelligently review the Board's decision. Specific findings of basic fact must reveal the Board's determination of the various relevant sub-issues and factual disputes which, in their sum, are dispositive of the particular claim or ultimate factual question before the Board. *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind.1981). It should be a straightforward statement of what happened; a statement of what the Board finds has happened, not a statement that a witness, or witnesses, testified thus and so. *Whispering Pines Home for Senior Citizens v. Nicalek*, 333 N.E.2d 324, 326 (Ind.App.1975). The findings should incorporate sufficient relevant detail to make it mentally graphic, i.e., it should enable the reader to picture in his mind's eye what happened. *Id.* And when the reader is a reviewing court, the statement must contain all the specific facts

relevant to the contested issue or issues so that the court may determine whether the Board has resolved those issues in conformity with the law. *Id.*

■ Concerning Daugherty's knee replacement, the board made the following factual findings:

Plaintiff was not satisfied with the result of disability from his pain and continued to pursue treatment options. Ultimately, he was recommended for total knee replacement by Peter J. Brooks, M.D., at the Cleveland Clinic. Following this recommendation, [Daugherty] communicated the findings to [ICE] through its workers compensation insurance carrier. The carrier's representative made it clear to [Daugherty] that the treatment was recommended by Dr. Brooks was not authorized at that time. Nevertheless, given his motivation to resolve this problem of long-standing, [Daugherty] proceeded with the surgery by Dr. Brooks . . . .

Based largely upon [Daugherty's] return to work and his credible testimony as to his improvement following the surgery by Dr. Brooks, it is found, with the benefit[ ] of hindsight, that Dr. Brooks' recommended care and treatment was reasonable and appropriate.

Nevertheless, as appropriate as the care was, it was clearly and definitively unauthorized by [ICE] and its workers compensation carrier at the. time [Daugherty] chose to go forward with it.

These findings demonstrate the Board's rationale in denying payment for Daugherty's knee replacement surgery and prospective medical treatment, and they provide an ample basis from which we may determine whether the Board acted in conformity with the law. The Board's findings are therefore sufficiently specific to

support its decision regarding the surgery.[3]

Affirmed.

MATTINGLY–MAY, J., concurs.

BAKER, J., dissents with separate opinion.

BAKER, Judge, dissenting.

I respectfully dissent with the majority's determination that the Board's denial of payment for Daugherty's knee replacement surgery was supported by sufficient evidence. To the contrary, the undisputed evidence establishes, and the Board so found, that "Dr. Brooks' recommended care and treatment," which included the surgery, was "reasonable and appropriate." Appellant's Br. p. 4. It is also undisputed that as a result of the surgery Daugherty was able to return to near normal work duties in the service of ICE. Thus, the only evidence to support the Board's denial of payment is its determination that Daugherty failed to get pre-approval for the surgery. While I fully acknowledge the need for prior approval, I believe that Daugherty's failure to secure such approval is greatly outweighed, if not negated, by the incontrovertible evidence and specific finding that the surgery was medically appropriate and effective.

In disregarding such evidence, the Board in effect penalizes Daugherty for rejecting the diagnosis by ICE's and the Board's doctors that would have left him with debilitating knee pain, incapable of returning to meaningful employment, and unable to adequately support his family and lead a physically unimpaired life. Moreover, the Board's decision unjustly rewards the employer, which receives the benefit of a fully capable employee at the employee's expense, and also unjustly punishes the employee for his resolve to recover full mobility and return to gainful employment. In my view, such an outcome is fundamentally unjust and does not serve the humane purposes of the Act.

Turning to the relevant statute, Indiana Code Section 22–3–3–4(d) provides, among other things, that:

> If, because of an emergency, or because of the employer's failure to provide an attending physician or surgical, hospital, or nursing services and supplies . . . or because of any other good reason, a physician other than that provided by the employer treats the injured employee during the period of the employee's temporary total disability . . . the reasonable cost of those services and supplies shall, subject to the approval of the workers compensation board, be paid by the employer.

"The thrust of this provision is that in the absence of an emergency or *other good reason,* an employee is not free to simply elect, at the employer's expense, additional treatment or other physicians than those tendered by the employer." *Perez v. U.S. Steel Corp.,* 172 Ind.App. 242, 244, 359 N.E.2d 925, 926 (Ind.Ct.App.1977) (emphasis added). In this instance, Daugherty elected to undergo the knee surgery after

---

**3.** As for the credit to ICE, the Board found, and Daugherty does not dispute, that ICE had made worker's compensation payments to Daugherty in the amount of $225 per week from October 1998 to February 1999—the period Daugherty spent recuperating from knee replacement surgery. The Board concluded that Daugherty was temporarily totally disabled during that time and was entitled to the higher disability payment rate of $404.28 per week. Accordingly, the Board awarded Daugherty the increased amount but credited ICE for the reduced payments that it made to Daugherty during his recuperation. These findings are specific enough to support the Board's decision and to allow us to adequately review that decision.

his employer refused to approve the surgery and after his employer's and the Board's authorized physicians indicated that he had reached a state of maximum recovery and would not be restored to nearly full functioning. In my view, the fact that the employer's physicians may have been incorrect in their assessment of Daugherty's injury and that this was not apparent until after the surgery took place, should not negate his ability to recover for its costs. If the Board had determined that the surgery was unnecessary, even after the fact, then Daugherty would not have been eligible for reimbursement. However, once the Board found that the procedure was necessary and proper, it is apparent to me that the requisite "good reason" for the treatment was established and required the Board to approve payment of the associated costs. Thus, I vote to reverse the Board's decision.